**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT ILLINOIS
EASTERN DIVISION**

Kim Oster-Holstein

                Plaintiff,

      v.

Caulipower LLC, and Gail Becker

                Defendants.

Case No.

## NOTICE OF REMOVAL TO FEDERAL COURT

**PLEASE TAKE NOTICE** that Defendants Caulipower LLC, and Gail Becker
(collectively "Defendants") hereby remove to this Court the state court action described below.

1.      On May 1, 2025, an action was commenced in the Circuit Court of Cook County,
County Department, Chancery Division of the State of Illinois, entitled *Kim Oster-Holstein v.
Caulipower LLC, and Gail Becker*, Case No. 2025CH04853.  True and correct copies of the
summons and complaint, with all exhibits attached thereto, which were filed in said action
(collectively, "the Documents") are attached hereto as Exhibit A.

2.      On May 15, 2025, Defendants received a copy of the Documents.

3.      This Notice of Removal is being filed within 30 days of the Defendants' receipt,
"through service or otherwise, of a copy of the initial pleading setting forth the claim for relief
upon which such action or proceedings is based," as required by 28 U.S.C. §1446(b).

4.      Upon information and belief, and as alleged in the state court complaint, Plaintiff,
Kim Oster-Holstein, was at the time the state court action was filed, and still is, a resident of the
State of Illinois.  *See also* Ex. A at ¶4.

5.      Defendant Caulipower LLC was at the time the action was filed, and still is, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Encino, California, and none of its members reside in the State of Illinois. *See also* Ex. A at ¶5.

6.      Defendant Gail Becker was a the time the action was filed, and still is, a resident of the State of New York.

7.      Plaintiff's complaint alleges and seeks a declaratory judgment that Plaintiff is a 50% owner of the defendant Caulipower LLC and plaintiff alleges that Caulipower LLC has a value in excess of five hundred million dollars. *See* Ex. A at ¶53-56.

8.      This Court may exercise original jurisdiction over this dispute pursuant to 28 U.S.C. §1441 and 28 U.S.C. §1332(a), because this is a civil action between a U.S. citizen and citizens of foreign states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      Defendants will serve Plaintiff and file with the Circuit Court of Cook County Chancery Court of the State of Illinois a Notice of Notice of Removal of Action to Federal District Court, as required by 28 U.S.C. §1446(d).

Dated:  June 13, 2025             Respectfully submitted,

                                   */s/ Phillip Barengolts*

                                     PATTISHALL, MCAULIFFE, NEWBURY, HILLIARD & GERALDSON LLP

                                     Phillip Barengolts
                                     Jessica A. Ekhoff
                                     Daniel S. Hess
                                     125 S. Wacker Drive, Suite 2050
                                     Chicago, Illinois 60606
                                     Telephone: 312-554-8000
                                     pb@pattishall.com
                                     jae@pattishall.com
                                     dsh@pattishall.com

                                     *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel S. Hess, hereby certify that a copy of the foregoing **NOTICE OF REMOVAL**

**TO FEDERAL COURT** shall be served upon the below-listed counsel for Plaintiff via email

contemporaneously with the filing of this Notice on June 13, 2025.

Jeffrey Strange
Jeffrey Strange & Associates
717 Ridge Road #1A
Wilmette, Illinois 60091
(847) 256-7377
jeffreystrangeattorney@gmail.com
jstrange@aol.com

*Counsel for Plaintiff*

*/s/ Daniel S. Hess*
Daniel S. Hess

# EXHIBIT A

# NATIONAL REGISTERED AGENTS, INC
## SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To: Michaela Macola
Caulipower, LLC
30501 AGOURA RD STE 110
AGOURA HILLS, CA 91301-4323

SOP Transmittal # 549138353

Entity Served: CAULIPOWER, LLC (Domestic State: DELAWARE)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc or its Affiliate in the State of DELAWARE on this 15 day of May, 2025. The following is a summary of the document(s) received:

1. **Title of Action:** KIM OSTER-HOLSTEIN vs. CAULIPOWER LLC

2. **Document(s) Served:** Other: --

3. **Court of Jurisdiction/Case Number:** None Specified
Case # 2025CH04853

4. **Amount Claimed, if any:** N/A

5. **Method of Service:** Process Server

6. **Date and Time of Receipt:** 05/15/2025 11:23:00 AM CST

7. **Appearance/Answer Date:** None Specified

8. **Received From:** None Specified

9. **Carrier Airbill #**

10. **Call Made to:** Not required

11. **Special Comments:**
NRAI will retain the current log

Image SOP

Email Notification, Michaela Macola  michaela.macola@eatcaulipower.com

Email Notification, Gail Becker  ap@eatcaulipower.com

**Registered Agent: NATIONAL REGISTERED AGENTS, INC**          **CopiesTo:**

**866-539-8692 - Telephone**

The information contained in this Summary Transmittal Form is provided by NRAI for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. NRAI disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

ORIGINAL

 Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:** Thu, May 15, 2025
**Server Name:** Wilmington Drop Serve

| Entity Served | CAULIPOWER, LLC |
|---|---|
| Case Number | 2025CH04853 |
| Jurisdiction | DE |

| Inserts | |
|---|---|
| | |



This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Courts.
Forms are free at ilcourts.info/forms.

| STATE OF ILLINOIS, CIRCUIT COURT | SUMMONS | For Court Use Only |
|---|---|---|
| Cook _____ COUNTY | | FILED 5/2/2025 12:45 PM Mariyana T. Spyropoulos CIRCUIT CLERK COOK COUNTY, IL 2025CH04853 Calendar, 12 32544198 |

| Instructions ▼ | |
|---|---|
| Enter above the county name where the case was filed. | Kim Oster-Holstein _____ **Plaintiff / Petitioner** *(First, middle, last name)* |
| Enter your name as Plaintiff/Petitioner. | v. |
| Below "Defendants/ Respondents," enter the names of all people you are suing. | **Defendants / Respondents** *(First, middle, last name)* Caulipower LLC, Gail Becker |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* |

**2025CH04853**

**Case Number**

## IMPORTANT: You have been sued.

- Read all documents attached to this Summons.

- You MUST file an official document with the court within the time stated on this Summons called an *Appearance* and a document called an *Answer/Response*. If you do not file an *Appearance* and *Answer/Response* on time, the judge may decide the case without hearing from you. This is called "default." As a result, you could lose the case.

- All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

- After you fill out the necessary documents, you need to electronically file (e-file) them with the court. To e-file, you must create an account with an e-filing service provider. For more information, go to ilcourts.info/efiling. If you cannot e-file, you can get an exemption that allows you to file in-person or by mail.

- You may be charged filing fees, but if you cannot pay them, you can file an Application for Waiver of Court Fees.

- It is possible that the court will allow you to attend the first court date in this case in-person or remotely by video or phone. Contact the Circuit Court Clerk's office or visit the Court's website to find out whether this is possible and, if so, how to do this.

- Need help? Call or text Illinois Court Help at 833-411-1121 or go to ilcourthelp.gov for information about going to court, including how to fill out and file documents. You can also get free legal information and legal referrals at illinoislegalaid.org. All documents referred to in this Summons can be found at ilcourts.info/forms. Other documents may be available from your local Circuit Court Clerk's office or website.

- ¿Necesita ayuda? Llame o envíe un mensaje de texto a Illinois Court Help al 833-411-1121, o visite ilcourthelp.gov para obtener información sobre los casos de la corte y cómo completar y presentar formularios.

### Plaintiff/Petitioner:

**Do not use this form** in these types of cases:

- All criminal cases
- Eviction
- Small Claims
- Divorce
- Order of protection
- Paternity
- Stalking no contact orders
- Civil no contact orders
- Adult guardianship
- Detinue
- Foreclosure
- Administrative review cases

For eviction, small claims, divorce, and orders of protection, use the forms available at ilcourts.info/forms. If your case is a detinue, visit illinoislegalaid.org for help.

**If you are suing more than 1 Defendant/Respondent,** attach an *Additional Defendant/Respondent Address and Service Information* form for **each** additional Defendant/Respondent.

Enter the Case Number given by the Circuit Clerk: 2025CH04853

In **1a**, enter the name and address of the first Defendant/ Respondent you are serving. If you are serving a Registered Agent, include the Registered Agent's name and address here.

**1. Defendant/Respondent's address and service information:**

a. Defendant/Respondent's primary address/information for service:

Name *(First, Middle, Last)*: Caulipower, LLC

Registered Agent's name, if any: National Registered Agents, Inc.

Street Address, Unit #: 160 Greentree Drive Suite 101

City, State, ZIP: Dover, DE 19904

Telephone: ________ Email: ________

In **1b**, enter a second address for the first Defendant/ Respondent, if you have one.

b. If you have more than one address where Defendant/Respondent might be found, list that here:

Name *(First, Middle, Last)*: ________

Street Address, Unit #: ________

City, State, ZIP: ________

Telephone: ________ Email: ________

In **1c**, check how you are sending your documents to this Defendant/ Respondent.

c. Method of service on Defendant/Respondent:

☐ Sheriff ☐ Sheriff outside Illinois: ________ *County & State*

☑ Special process server ☐ Licensed private detective

Check here if you are serving more than 1 Defendant/ Respondent. Attach an *Additional Defendant/ Respondent Address and Service Information* form for each additional Defendant/Respondent and write the number of forms you attached.

☐ **I am serving more than 1 Defendant/Respondent.**

I have attached ________ *(Number)* *Additional Defendant/Respondent Address and Service Information* forms.

In **2a**, enter the amount of money owed to you. Check **2b** if you are asking for the return of tangible personal property.

**2. Information about the lawsuit:**

a. Amount claimed: $ ________

☐ b. I am asking for the return of tangible personal property (items in the Defendant/Respondent's possession).

In **3**, enter your complete address, telephone number, and email address, if you have one.

**3. Contact information for the Plaintiff/Petitioner:**

Name *(First, Middle, Last)*: Jeffrey Strange, Jeffrey Strange & Associates

Street Address, Unit #: 717 Ridge Road #1A

City, State, ZIP: Wilmette IL 60091

Telephone: 847-256-7377 Email: jeffreystrangeattorney@gmail.com

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

**Important information for the person getting this form**

You have been sued. Read all of the documents attached to this *Summons*. To participate in the case, you must follow the instructions listed below. If you do not, the court may decide the case without hearing from you and you could lose the case. *Appearance* and *Answer/Response* forms can be found at: ilcourts.info/forms.

Check **4a** or **4b**. If Defendant/Respondent only needs to file an *Appearance* and *Answer/Response* within 30 days, check box **4a**. Otherwise, if the clerk gives you a court date, check box **4b**.

**4. Instructions for person receiving this *Summons* (Defendant):**

☐ a. To respond to this *Summons*, you must file *Appearance* and *Answer/Response* forms with the court within 30 days after you have been served (*not counting the day of service)* by e-filing or at:

Address: 50 W. Washington Street, Chancery Division,

City, State, ZIP: Chicago IL 60602

| | |
|---|---|
| In **4a**, fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/Response.* | ☑ b.   Attend court: |

b.   Attend court:

On: <u>07/01/2025</u>    at   <u>10:00</u>   ☑ a.m. ☐ p.m. in   <u>2403</u>

        *Date*           *Time*                        *Courtroom*

**In-person at:**

<u>50 W Washington Street Chicago IL 60602</u>

*Courthouse Address*       *City*                   *State*      *ZIP*

**OR**

**Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance"):

     By telephone:   <u>312-626-6799</u>

                            *Call-in number for telephone remote appearance*

     By video conference:   <u>Zoom</u>

                                *Video conference website*

     <u>Zoom ID: 990 0014 8007   Passcode: 545631</u>

     *Video conference log-in information (meeting ID, password, etc.)*

Call the Circuit Clerk at:   <u>312-603-4181</u>        or visit their website

                       *Circuit Clerk's phone number*

at:   <u>www.cookcountycourt.org</u>      to find out more about how to do this.

     *Website*

| | |
|---|---|
| In **4b**, fill out:<br>• The court date and time the clerk gave you.<br>• The courtroom and address of the court building.<br>• The call-in or video information for remote appearances (if applicable).<br>• The clerk's phone number and website. All of this information is available from the Circuit Clerk. | |

| | |
|---|---|
| **STOP!**<br>The Circuit Clerk will fill in this section. | **Witness this Date:** _____<br><br>**Clerk of the Court:** <u>5/2/2025 12:45 PM Mariyana T. Spyropoulos</u> |

---

**STOP! The officer or process server will fill in the Date of Service**

**Note to officer or process server:**

- If 4a is checked, this *Summons* must be served within 30 days of the witness date.
- If 4b is checked, this *Summons* must be served at least 21 days before the court date, unless 2b is also checked.
  - If 4b and 2b are checked, the *Summons* must be served at least 3 days before the court date.

---

Date of Service: _____

                     *(Date to be entered by an officer or process server on the copy of this Summons left with the Defendant or other person.)*

This form is approved by the Illinois Supreme Court and must be accepted in all Illinois Courts.
Forms are free at ilcourts.info/forms.

| STATE OF ILLINOIS, CIRCUIT COURT | PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION | For Court Use Only |
|---|---|---|
| Cook     COUNTY | | |

| Instructions | | |
|---|---|---|
| Enter above the county name where the case was filed. | Kim Oster-Holstein<br>**Plaintiff / Petitioner** *(First, middle, last name)* | |
| Enter your name as Plaintiff/Petitioner. | | |
| Enter the names of all people you are suing as Defendants/Respondents. | v.<br><br>Caulipower LLC, Gail Becker<br>**Defendant / Respondent** *(First, middle, last name)* | |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** *(Check this box if this is not the 1st Summons issued for this Defendant.)* | 2025CH04853<br>**Case Number** |

**\*\*Stop. Do not complete the form. The sheriff or special process server will fill in the form. Give them one copy of this blank *Proof of Service* form for each Defendant/Respondent.\*\***

My name is _____ and I state
                *First, Middle, Last*

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent

_____ as follows:

*First, Middle, Last*

    ☐ Personally on the Defendant/Respondent:

        ☐ Male  ☐ Female  ☐ Non-Binary  Approx. Age: _____ Race: _____

        On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

        Address, Unit#: _____

        City, State, ZIP: _____

    ☐ On someone else at the Defendant/Respondent's home who is at least 13 years old and is a family member or lives there:

        On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

        Address, Unit#: _____

        City, State, ZIP: _____

        And left it with: _____

                    *First, Middle, Last*

        ☐ Male  ☐ Female  ☐ Non-Binary  Approx. Age: _____ Race: _____

        and by sending a copy to this defendant in a postage-paid, sealed envelope to the above address on this date: _____ .

    ☐ On the Corporation's agent, _____

                              *First, Middle, Last*

        ☐ Male  ☐ Female  ☐ Non-Binary  Approx. Age: _____ Race: _____

        On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.

        Address: _____

        City, State, ZIP: _____

☐ **I was not able to serve the *Summons* and Complaint/Petition on Defendant/Respondent:**

_____
*First, Middle, Last*

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

1.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

2.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

3.  On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____
    Other information about service attempt: _____
    _____
    _____
    _____

| | |
|---|---|
| **DO NOT** complete this section. The sheriff or private process server will complete it. | **If you are a special process server, sheriff outside Illinois, or licensed private detective, your signature certifies that everything on the *Proof of Service of Summons* is true and correct to the best of your knowledge. You understand that making a false statement on this form could be perjury.** |

Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony.

**By:**                                         **FEES**

_____          Service and Return:   $ _____
*Signature by:* ☐ Sheriff                  Miles _____      $ _____
               ☐ Sheriff outside Illinois:   Total                      $ _____

               _____
               *County and State*
               ☐ Special process server
               ☐ Licensed private detective

_____
*Print Name*

If *Summons* is served by licensed private detective or private detective agency:
License Number: _____

Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH04853
Calendar, 12
32528255

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CHANCERY DIVISION

KIM OSTER-HOLSTEIN,                )
                                   )
            Plaintiff,             )        **2025CH04853**
                                   )
        -vs-                       )        Case No. 2025CH
                                   )
CAULIPOWER LLC, GAIL BECKER,       )
                                   )
            Defendants.            )

## COMPLAINT FOR DECLARATORY JUDGMENT AND BREACH OF CONTRACT

NOW COMES Kim Oster-Holstein by her attorneys Jeffrey Strange and Rod

Radjenovich of Jeffrey Strange and Associates and complains of Caulipower LLC and Gail

Becker as follows:

### NATURE OF THE ACTION

1. This suit involves Gail Becker and Caulipower's actions to deny Kim Oster-Holstein's

50% ownership interest in Caulipower LLC (hereinafter "the Company") as a result of an

agreement set forth in emails and evidenced by an Operating Agreement.

2. Beginning in November of 2015 and continuing into May of 2016 Kim Oster-Holstein

brought the concept of a cauliflower pizza crust from an idea to a marketable product with her

original recipe and used her personal contacts to locate co-manufacturers capable of producing

the product. Gail Becker worked at her full time job until April 2016.

3. After all this work was done to bring the company and product to fruition, Gail Becker

prevented Kim Oster-Holstein from participating as a Co-Manager in the day-to-day

management and control of the Company and ignoring and denying her 50% ownership interest.

## PARTIES AND RELEVANT NON-PARTIES

4. Kim Oster-Holstein is a citizen and resident of Wilmette, Cook County, Illinois and a co-founder and half-owner of Caulipower LLC.

5. Nominal Defendant Caulipower LLC is a Delaware Corporation with its offices in Encino, California  It is in the business of making gluten free products with cauliflower substituted for flour with recipes created initially by Plaintiff.

6. Gail Becker is a citizen and resident of Los Angeles, California.

7. That Brad Schwartz, at all times relevant hereto, was a licensed attorney in the State of California and the Managing Partner of Strategic Law Partners LLP located in Los Angeles, and the ex-husband of Gail Becker at the time of the formation of Caulipower LLC.

8. The Pattishall law firm had acted as counsel for other Holstein businesses and as a result Kim Oster-Holstein hired them to represent the Caulipower LLC start up.  Pattishall later turned on Kim Oster-Holstein when she was frozen out by Gail Becker, and remains counsel for Caulipower LLC.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the parties and the subject matter of this proceeding and the Defendants pursuant to 735 ILCS 5/2- 209 because Defendant conducts substantial business in the State of Illinois and Kim Oster-Holstein's claims arise out of Gail Becker's conduct that was directed to Illinois and contracts that were entered into in the State of Illinois.

10. Venue is proper in this Court under 735 ILCS 5/2-101 and 735 ILCS 5/2-102 because a substantial part of the events or omissions giving rise to the claims occurred in Cook County, Illinois and Defendant Gail Becker reached into Illinois to negotiate a venture with Plaintiff that

2

resulted in a Limited Liability Company being formed and an agreement as to the Operating
Agreement of the Limited Liability Company.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

11. That Kim Oster-Holstein in 2015 had extensive experience in starting food
companies, and getting new food items manufactured and distributed through a network of
contacts she had developed over the years.

12. That in 2015 Kim Oster-Holstein had twenty years experience in creating food for
people with allergies.

13. That in 2008 Gail Becker and Kim Oster-Holstein met at a Forbes women's event in
New York City and became friends.

14. That Gail Becker at the time of the meeting was head of Strategic Partnership and
Global Integration at Edelman Worldwide, had never started a business, and had no experience
in food manufacturing. She had been working at Edelman Worldwide for fifteen years at the
time.

15. That Kim Oster-Holstein had her own gourmet pretzel company at the time.

16 Due to Kim Oster-Holstein's experience she knew how to find the right co-
manufacturers to produce food products once she provded a recipe.

17 . On November 7, 2015 Gail Becker emailed Kim-Oster Holstein in  Wilmette, Cook
County, Illinois and said:

"Hi there. Hope all is well. It's been too long. Love watching your life unfold on FB. I
had a crazy idea for a food product that I can't find on the market. You're the only one I
know in the business. Intrigued and want to talk? Gail x."

18. Kim-Oster Holstein responded to the email on November 7, 2015 and said:

"Gail, Hi there! I'm grateful for Facebook and the chance to stay connected through our
life journeys. I have thought of you much through the passing of your dad and your

3

beautiful wedding and honeymoon. And YES, I'm intrigued and would love to talk! I've been obsessing over a few product concepts lately. I want to hear more about your ideas, and would love to help in any way I can!"

19. Gail Becker responded on November 7, 2015 and said:

"And I've been obsessing over starting a business: we're a match made in heaven!"

20. On November 9, 2015, Gail Becker, Defendant and Kim Oster-Holstein talked on the phone and Gail Becker stated that she had never started a business, and with the passing of her dad felt a calling to take a new path with the money her dad had left her.

21. That on November 9, 2015 Defendant Gail Becker asked Plaintiff Kim Oster-Holstein to be her 50/50 partner which offer she accepted.

22. That Plaintiff and Defendant immediately began brainstorming in regard to what business to start and considered different ideas before settling on a company that would nourish people, that would be run by two moms and be a woman owned business that would give them access to panels, keynotes and groups as a way of marketing.

23. The Plaintiff and Defendant considered names such as Cauli-crust, Cauli-girls and other Cauliflower referenced names. The name Caulipower was ultimately settled upon.

24. The Plaintiff and Defendant Gail Becker decided that Cauliflower crust pizza was going to be their first product.

25. That on November 9, 2015 Plaintiff Kim Oster-Holstein made her first cauliflower pizza and began refining the recipe.

26. The Plaintiff and Defendant Gail Becker consulted with Defendant's ex-husband Brad Schwartz as the attorney to help with formation of the company as a limited liability company in Delaware, with Plaintiff and Defendant Gail Becker each owning half of the membership interest and both being managers, which was confirmed in emails by Plaintiff and

4

Defendant Gail Becker in emails dated November 16, 2015 and November 17, 2015. Copies of the email chain are attached hereto as Exhibit A.

27. That included in the November 16, 2015 email, which Defendant Gail Becker was copied on, was the reaffirmation of the 50/50 ownership of the new entity which became Caulipower LLC. The email stated: "We both agree that we should be 50/50 in terms of ownership". A copy of the email chain is attached hereto as Exhibit A.

28. On November 16, 2015, Plaintiff wrote to Attorney Brad Schwartz and Defendant Gail Becker concerning the retention of the Pattishall law firm in Chicago, which was experienced in patent and trademark work and which she was familiar with.

29. Plaintiff set up the original meeting with the Pattishall law firm by calling Phil Barengolts.

30. That in December of 2015 an Operating Agreement was prepared which set forth the parties' agreement and which showed Defendant Gail Becker and Plaintiff as each owning 5,000,000 common units equal to each owning 50% of the membership interest. A copy of the Operating Agreement is attached hereto as Exhibit B.

31. Section 4.2 of the Operating Agreement provided that Gail Becker and Kim Holstein would be the initial Members of the Board of Managers.

32. On January 15, 2016, and after an initial meeting the Pattishall law firm sent a "terms of engagement letter" for legal work, including patent and trademark work and an opinion letter for the name Caulipower. The letter was directed to Plaintiff and both Plaintiff and Gail Becker signed the engagement letter. A copy of the signatures to the agreement is attached hereto as Exhibit C.

5

33. In late January and early February of 2016, the Pattishall law firm, at the direction of Plaintiff, conducted trademark searches for the names Cauli-flour and Caulipower and prepared an application to register the names. The invoice to Cauli-Power was sent by the Pattishall law firm to Plaintiff's home in Wilmette, Illinois.

34. Plaintiff ,in furtherance of the Caulipower business and at the request of Gail Becker, in March of 2016 flew to Los Angeles to attend the Expo West natural food industry trade show in Anaheim and stayed at Defendant's home in Los Angeles.

35. Plaintiff attended the Expo West trade show. Defendant had laryngitis and was unable to attend. Plaintiff found that no products with cauliflower were exhibiting and therefore determined that it was time for cauliflower pizza to make its debut as a healthy choice for people who could not tolerate wheat or were looking for vegetable based products.

36. Plaintiff's extensive experience allowed her to determine the value and need for cauliflower pizza crust in the market.

37. On March 26, 2016 Plaintiff put together an agenda for a meeting which set out the business plan for their business going forward after reciting past events. A copy is attached hereto as Exhibit D.

38. As part of Plaintiff's planning, she created the following outline which was instrumental in Caulipower being able to start in business and the following steps were included in the "go to market plan":

a. Strategic Plan/Go to Market Plan
b. Prepare how to pitch to investors
c. Develop budget including  skeleton costs and source of funds
d. Set up Quickbooks accounting system
e. Plan for system to manage account receivables and accounts payables
f. Plan to offer board seats to investors
g.Pitch products in specialty channels
h. Manage promotional schedule  to support launch

6

    i.  Develop support for initial distribution and expanded distribution
    j.  Recommend how to utilize critical broker networks
    k.  Develop brand ambassador program along with blogger network
    l.  Website Development ideas

    39.  Plaintiff performed the work to set up the company which included but is not limited

to the following:

    a. Research of the competitive landscape;
    b. Research and Development of the launch of the initial product line and subsequent product lines;
    c. Investigate purchase of website domains;
    d. Locate potential co-packers and attend meetings;
    e. Locate design team to create packaging and logo.
    f. Determined that the product could be made for a price that could be profitable
    g. Locate a distributer for the product and determine the cost

    40. In April of 2016 Defendant Gail Becker quit her job at Edelman Worldwide to work

on Caulipower with Plaintiff and signed a letter with the Startup Legal Shop at the Law Offices

of Chicago-Kent, where both Gail Becker and Kim Oster-Holstein described themselves as co-

founders. A copy is attached hereto as Exhibit E.

    41. On May 3, 2016, Plaintiff, after months trial and error, had produced a cauliflower

pizza crust recipe which was ready for a co-producer-manufacturer to try to mass produce. The

Defendant Gail Becker took no part in the development of the crust recipe.

    42. That Plaintiff, based upon her experience in the food industry and contacts she had

developed over the years, contacted a co-manufacturer consultant that she knew was best suited

to locate a co-manufacturere to produce the cauliflower crust pizza.

    43. JPG Resources Inc. was settled upon as the first co-producer and Plaintiff worked

with that consultant to tweak the recipe with the result being a quality product ready to

manufacture.

44. On May 2, 2016 Plaintiff Kim Oster-Holstein signed a confidentiality agreement on behalf of Caulipower LLC with JPG Resources Inc.

45. That on May 4, 2016 Plaintiff emailed Defendant Gail Becker the formula she had developed for the cauliflower pizza crust that was to be given to their co-manufacturer for production purposes.

46. On May 6, 2016 a non-disclosure agreement was signed with a second co-manufacturer, Nations Pizza LP, on behalf of Caulipower.

47. On May 6, 2016 Caulipower LLC was organized as a Limited Liability Company in Delaware and Plaintiff executed the Certificate of Formation which is attached hereto as Exhibit F, all in compliance with The Delaware Limited Liability Act Section 18-301(a) and therefore admitted as a member.

48. That on May 9, 2016 Kim Oster-Holstein was billed for the formation of Cauiipower LLC $409.00 by CT Corp as an organizer. A copy is attached hereto as Exhibit G.

49. That on May 9, 2016, Amber Howard of Brad Schwartz' law firm emailed both Plaintiff and Defendant Gail Becker and wrote:

"Attached please see evidence of your LLC formation. I will get the qualification form for CA and IL, ready for filing."

Gail Becker then replied:

"That's a very special piece of electronic paper. Thank you so much."

50. The business of Caulipower LLC was ready to launch and the partners' dreams were about to come to fruition.

51. That after May 9, 2016, Gail Becker cut off communication with Plaintiff regarding management of the business.

8

52. That in 2017 the Pattishall law firm along with Defendant Gail Becker pressured Plaintiff, as a member of Caulipower LLC, to relinquish her rights to the recipe she had created for cauliflower pizza along with other intellectual property and transfer it to Caulipower LLC in exchange for a payment of $25.00, which was never received.

53. That Plaintiff contributed the recipe because she owned 50% of the company and this was part of her initial contribution.

54. That Caulipower LLC on information and belief has a value in excess of five hundred million dollars.

55. That at all times Plaintiff has retained her fifty percent membership interest in Caulipower LLC and has not resigned, been removed or agreed to be removed in accordance with the Operating Agreement or other means.

56. That Plaintiff is entitled to equal distributions with Gail Becker pursuant to DE ST TI 6 § 18-606 and Section 8.1 of the operating agreement but she has not received any distributions.

57. That no new members may be admitted to Caulipower LLC without approval of the Board of Managers pursuant to Section 3.7 of the Operating Agreement.

58. That Plaintiff and Defendant Gail Becker were the Managers of Caulipower LLC pursuant to Section 4.2(a) of the Operating Agreement and their agreement is memorialized in the emails set forth above.

59. That Plaintiff or other Managers cannot be removed without a majority in interest of the Board of Managers so voting pursuant to Section 4.2(i) of the Operating Agreement.

60. That limited liability company agreements need not be signed to be enforceable pursuant to Del. Code Ann. tit. 6, § 18-101 which states as follows:

"Limited liability company agreement" means any agreement (whether referred to as a limited liability company agreement, operating agreement or otherwise), written, oral or

9

implied, of the member or members as to the affairs of a limited liability company and the conduct of its business."

61. That section 14.13 of the Operating Agreement provides that:

"This Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware (without giving effect to any conflict of laws provisions). Any apparent conflict between the Agreement and the LLC Act will be resolved in favor of this Agreement except as otherwise required by the Act."

62. Del. Code Ann. tit. 6, § 18-1101 provides:

"A limited liability company agreement that provides for the application of Delaware law shall be governed by and construed under the laws of the State of Delaware in accordance with its terms."

63. At all times Plaintiff is presumed to be the owner of five million common units or 50% of issued shares of the Company, Caulipower LLC as set forth in the Operating Agreement.

64. That the Operating Agreement of Caulipower LLC, attached hereto as Exhibit B, is a contract between Plaintiff and Defendant Gail Becker.

65. That the Operating Agreement provides that Gail Becker and Plaintiff shall each own five million units and act as Co-Managers.

66. That Gail Becker has usurped control of the Company and not allowed Plaintiff to act as a Member or Co-Manager.

67. That Gail Becker has on information and belief made significant distributions to herself and paid herself a large salary while excluding Plaintiff from distributions and earning a salary as a Co-Manager.

## DECLARATORY JUDGMENT

68. That Plaintiff and Defendant agreed to be 50/50 partners on November 9, 2015 and prepared an Operating Agreement, attached hereto as Exhibit B, confirming ownership in Caulipower LLC.

10

69. There is an actual dispute between Caulipower LLC and Gail Becker on the one hand and Plaintiff on the other hand, in regard to the membership interest in Caulipower LLC.

WHEREFORE Plaintiff prays:

1. That this Honorable Court issue a declaratory judgment finding that Plaintiff Kim Oster-Holstein is a 50% member of Caulipower LLC or that Gail Becker and Kim Oster-Holstein are equal partners in Caulipower.

2. For such further relief as this Court deems just.

*/s/Jeffrey Strange*

Attorney Code 22702
Jeffrey Strange, ARDC #3122923
Jeffrey Strange & Associates
717 Ridge Road #1A
Wilmette, Illinois 60091
(847) 256-7377
jeffreystrangeattorney@gmail.com
jstrangelaw@aol.com

11

# EXHIBIT A

 **Gmail**

---

## Follow Up Issues for you to consider

---

Becker, Gail <████████████████>                                  Tue, Nov 17, 2015 at 8:57 AM
To: Kim Holstein <████████████████>, "Bradley D. Schwartz" <████████████████>
Cc: "beckergailf████████████ <beckergailf████████████>

Thank you so much, Kim, for this absolutely perfect overview.

Just moving to my other email…

**From:** Kim Holstein [mailto:████████████]
**Sent:** Monday, November 16, 2015 6:47 PM
**To:** Bradley D. Schwartz
**Cc:** Becker, Gail
**Subject:** Re: Follow Up Issues for you to consider

Brad,

Gail and I had a good call yesterday, and reviewed all your discussion points. Here are some thoughts and additional questions to utilize for a follow-up call with the three of us.

In response to the 7 initial items:

1. We both agree LLC is a great choice. Delaware for LLC makes sense. How is it determined about qualifying to do business in CA and IL, and how much are the filing fees? Our intention is to sell nationally, and then internationally. Manufacturing could be in a completely different state, with both of us working in our prospective states. Can you provide a cost breakdown of legal fees to set up LLC?

2. We need to finalize name for the entity. We have a list and will narrow down and finalize asap. Our strategy is to form a food company "name TBD" with the initial brand launch having the name Cauli-Crust.

3. We both agree that we should be 50/50 in terms of ownership.

4. In terms of determination of what each will commit from a service and time standpoint, we need to define for each of us with more detail. We spent a considerable time on the call sharing about our current working situations, and our intention to build a successful, innovative, women-owned, healthy food company, inspired by 2 moms...that makes a difference along the way.

We both have current challenges in terms of time at this point: Gail has her full-time job at Edelman, and I have full time commitments with the Crave Bar and consulting on the side with my consulting company, TwistWorks, as a source of income.

One idea that I proposed to Gail: the idea of her buying out my husband's share of Nourish Foods Group, our company with the brand, The Crave Bar, along with the concept I have been working on, Paleo POWer. This brings together my current initiatives under one umbrella, and it was an idea to put out. I am open to both paths: starting a new LLC with Gail, and keeping my other businesses separate, or exploring this concept.

5. In looking at initial capital contribution, we talked about the goal to invest equal amounts at 50/50, and then raise funds for the gap between funds needed and funds from our initial contributions. I am preparing an initial draft estimate for Use of Funds so that we can determine start-up investment needed, as well as growth capital short-term and longer term.

6. Deadlock issue- we would look to your guidance for possible solutions to incorporate into an agreement. At this time, we feel a great synergy and on the same page going in. However, it makes sense to have some buyout provisions or outs in the event of a deadlock that is not resolved.

7. With the concept of vesting of ownership, this makes sense. One thought is that a 4 year vesting schedule might be long for a food company start-up. Just something to consider.

We are preparing a list of trademark and website names for intellectual property that we want to evaluate for availability. For the website names, we can review and purchase the available sites. For trademarks, can you research availability of our list we will provide, and handle all applications? Can you provide estimate of costs?

We would like to review list and discuss cost/value of how deep to go (in terms of potential related trademarks for product lines, extensions to own this niche category)

We want to set up the LLC as a woman owned business (women's business enterprise). Have you worked with WBE's? If not, no worries. I can work with the team at Chicago's Women's Business Development Center and ask about our certification. We did this with our pretzel company, and there are many advantages.

Have you done legal for pursuing a patent? I have some contacts here and in Arizona (patent lawyer) that we can utilize, but thought we'd see if you have expertise or contacts you recommend.

What is your hourly rate? We want to be clear with your time/rates as we work through these start-up issues.

I thought I would put out all these questions and thoughts prior to our next call.

Thank you Brad! Really appreciate your guidance as we work to launch this exciting, new company!

Best,


On Wed, Nov 11, 2015 at 12:29 PM, Bradley D. Schwartz <​███████████████████> wrote:

1.   Choice of entity.  You would probably want a tax flow through (like an llc which is very flexible).  We generally use Delaware for llcs, but you may need to qualify to do business in California and Illinois at some point (not a big deal but will involve filing fees).

2.  Name for the entity.  It is pretty easy to change the name, so might choose an intial  name without a lot of work, but before really spending marketing money should do things like trademark search etc.

3.  Ownership.   50/50.

4.  Determination of what each will commit from a service and time standpoint.

5.  Determination of initial capital contribution (if you don't do the initial contribution 50/50 there are some potential tax issues to deal with).  Analysis of how much to put up and how long that is expected to last and discussion about what to do after that.

6.  Deadlock issue.   With 50/50 partnerships, major decisions will require approval of both of you.   Making sure that you do not have a deadlock issue is partially a

function of making sure you are on the same page going in. However, you can also address deadlock issues in the agreements if you want (solutions range from third party with the tiebreaking decision power, buyout provisions on deadlock etc.)

7. Concept of vesting of ownership. (ie if someone does not continue to provide services to the company they forfeit some of their equity). In our typical technology start up or venture backed company, the typical vesting schedule is four years (25% vests after one year and then monthly vesting over the next 36 months). However, it really should be tailored to what makes sense for this company.

**Brad Schwartz**

Managing Partner

Strategic Law Partners, LLP

500 S. Grand Ave, STE 2050

Los Angeles, CA 90071

P. (213) 213-7310

F. (213) 213-7301

---

**From:** Tran, Thao [mailto███████████████]
**Sent:** Tuesday, November 10, 2015 2:08 PM
**To:** Bradley D. Schwartz {███████████████▶; Kim Holstein ◀███████████████▶
**Cc:** Becker, Gail ◀███████████████▶
**Subject:** RE: Connecting us all...

Sure.

Please use: 1-866-571-8751

passcode 323 202 1037

---

**From:** Bradley D. Schwartz [███████████████]
**Sent:** Tuesday, November 10, 2015 1:50 PM
**To:** Tran, Thao
**Cc:** Becker, Gail; Kim Holstein
**Subject:** RE: Connecting us all...

Yes. Can we have a call in number (not sure where I will be).

**Brad Schwartz**

Managing Partner

Strategic Law Partners, LLP

500 S. Grand Ave, STE 2050

Los Angeles, CA 90071

P. (213) 213-7310

F. (213) 213-7301

From: Tran, Thao [mailto: ███████████]
Sent: Tuesday, November 10, 2015 1:35 PM
To: Bradley D. Schwartz <████████████████>
Cc: Becker, Gail <███████@█████████████>; Kim Holstein <████████████████>
Subject: RE: Connecting us all...

Hello Brad – Are you available for call today @ 4pm PT?  This time works for both Gail and Kim.  Looking forward to your confirmation.

Best,

Thao Tran I Executive Assistant to Gail Becker I Edelman

5900 Wilshire Blvd. 24th Floor, Los Angeles CA 90036

(323) 202-1036

From: Becker, Gail
Sent: Tuesday, November 10, 2015 1:02 PM
To: Tran, Thao
Cc: Bradley D. Schwartz; Kim Holstein
Subject: Connecting us all...

Thao, could you please schedule a call for the three of us? If we could do this week, that would be ideal. Thanks.

Gail Becker • President, Strategic Partnerships and Global Integration • Edelman

5900 Wilshire Blvd. 24th Floor, Los Angeles CA  90036

(323) 202-1037
twitter: @gailfbecker

blog: http://www.edelman.com/conversations/yes-i-can-walk-in-these/

Kim Oster-Holstein

Co-Founder/CIO (Chief Inspiration Officer)

Chief Chocolate Officer

**THE CRAVE BAR**

**What do you CRAVE?** Water skiing on a smooth lake. Hot summer
days. Time to do nothing. Spontaneous adventures. Salty sweet treats.
A movie that consumes all of you. Soulful inspiration. A long bike ride.
Hanging out with old friends. Pretzels and dark chocolate. Courage
to be your wild self. Truth. Taking the road less travelled. Giant laughter.
Enjoying the moments of life.... What do you CRAVE?

**www.thecravebar.com**

**312-804-9972 (cell)**

# EXHIBIT B

**OPERATING AGREEMENT**

**OF**

**[NEWCO, LLC 2015]**

**(A Delaware Limited Liability Company)**

# OPERATING AGREEMENT

## OF

## [NewCo, LLC 2015]

This Operating Agreement (this "Agreement") of **[NewCo, LLC 2015]** a Delaware limited liability company (the "Company"), is made as of this December __, 2015 (the "Effective Date"), by and among the individuals and entities listed on Exhibit A of this Agreement (each a "Member" and collectively, the "Members").

WHEREAS, the Members are contributing funds to the Company in exchange for Units (as defined below) pursuant to the terms of a Restricted Unit Agreement, with the amount of such contributions and number of Units set forth on **Exhibit A** attached hereto; and

WHEREAS, the Members desire to enter into this Agreement setting forth their understandings with respect to the Company.

Accordingly, in consideration of the premises, the mutual promises and obligations contained herein, and with the intent of being legally bound, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.1**    Definitions.  For purposes of this Agreement, capitalized terms used herein shall have the following meanings:

"Act" or "LLC Act" means the Delaware Limited Liability Company Act, as it may be amended from time to time.

"Adjusted Capital Account" shall mean, with respect to any Member, the balance in such Member's Capital Account as of the end of the relevant Fiscal Year, and any other applicable period, after giving effect to the following adjustments:

(a)    such Capital Account shall be increased by any amounts that such Member is obligated to restore to the Company (pursuant to this Agreement or otherwise) or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(b)    such Capital Account shall be decreased by the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted and applied consistently therewith.

"Affiliate" of a party shall mean any entity which directly or indirectly Controls, is Controlled by or is under common Control with such party.

1

"Agreement" shall have the meaning set forth in the introductory paragraph to this Agreement.

**["Appraisal" Each of the parties requiring an interest or property to be valued shall appoint an appraiser and give notice of the appointment to the other within ten (10) days after the event causing the need for Appraisal. If either fails to appoint an appraiser within such time, the appraiser appointed by the other shall be the sole appraiser and shall appraise the Fair Market Value within thirty (30) days after notice of appointment. Each appraiser appointed shall have at least five (5) years' experience appraising interests or property similar to that for which valuation is being sought. Each appraiser shall establish Fair Market Value by reference to such indicators of value as the appraisers deem relevant. If two appraisers are appointed, they shall independently appraise the Fair Market Value within thirty (30) days after notice of appointment of the second appraiser. If the higher appraisal is less than one hundred ten percent (110%) of the lower appraisal, then the Fair Market Value shall be the average of the two appraisals. If not, the two appraisers shall attempt to elect a third appraiser. If no third appraiser is agreed upon within sixty (60) days after appointment of the second appraiser, either party may ask the presiding judge of the highest court of the county in which the Company's principal office is located to appoint a third appraiser. The third appraiser shall be a person who has not previously acted in any capacity for either party. The parties in interest shall each pay the fees of the appraiser they appoint, and shall share equally the fees of any appointed third appraiser and the fee charged by any judge to make such appointment. Within thirty (30) days after selection of the third appraiser, the third appraiser shall select one of the two appraisals, and such appraisal shall be the Fair Market Value.]**

"Available Cash" shall mean, at any time, that portion of the Company's cash on hand which the Board of Managers, in good faith, deems available for distribution to the Members, taking into account (a) the Company's working capital requirements, (b) the amount of cash required for the payment of all current expenses, liabilities and obligations of the Company (whether for expense items, capital expenditures, improvements, retirement of indebtedness or otherwise) and (c) the amount of cash which the Board of Managers deems in good faith necessary to establish prudent reserves for the payment of future contingencies, known or unknown, liquidated or unliquidated, including, but not limited to, liabilities which may be incurred in litigation or with respect to obligations of indemnification.

"Bankruptcy" shall mean, with respect to any Member, when (a) such Person shall commence any case, proceeding or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or such Person shall make a general assignment for the benefit of its creditors; (b) there shall be commenced against such Person any case, proceeding or other action of a nature referred to in clause (a) above that remains unvacated, unstayed, undismissed or undischarged for a period of sixty (60) days; or (c) there shall be commenced against such Person any case, proceeding or other action seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, dismissed or stayed or bonded pending appeal within sixty (60) days from the entry thereof.

"Board of Managers" shall mean the Board of Managers of the Company created pursuant to **Section 4.2**.

"Business Day" shall mean any day other than Saturday, Sunday and any other day on which banks in Delaware are permitted or required to close.

2

"Capital Account" shall mean the capital account established and maintained for each Member pursuant to Section 7.1.

"Capital Contribution" shall mean the amount of cash and the Fair Market Value (at the date of contribution) of property (net of liabilities secured by such property that the Company is considered to assume or take subject to under Section 752 of the Code) contributed by a Member to the capital of the Company and any Company liabilities assumed by a Member within the meaning of Section 1.704-1(b)(2)(iv)(c) of the Regulations.

"Certificate of Formation" shall mean the Certificate of Formation of the Company, as the same may be amended, supplemented or restated from time to time.

"Change of Control" shall mean, in one transaction or series of related transactions, (i) the closing of the sale, transfer, or other disposition of all or substantially all of the Company's assets, (ii) the consummation of the merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of Units of the Company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the Units of the Company or the surviving or acquiring entity in substantially the same proportions as immediately prior to such transaction or related transactions), (iii) the closing of the Transfer (whether by merger, consolidation or otherwise) to a person or group of Affiliated persons of the Units if, after such closing, such person or group of affiliated persons would hold more than 50% of the outstanding Units of the Company (or the surviving or acquiring entity), other than a bona fide equity financing, or (iv) any Liquidation.

"Code" shall mean the Internal Revenue Code of 1986, as amended (including corresponding provisions of subsequent or successor revenue laws).

"Common Units" shall mean a Unit designated as a Common Unit under this Agreement.

"Company" shall have the meaning set forth in the introductory paragraph to this Agreement.

"Company Minimum Gain" has the meaning ascribed to the term "partnership minimum gain" in Regulations Section 1.704-2(d).

"Control" shall mean the power to direct the affairs of an entity by reason of ownership of equity securities, by contract, or otherwise.

"Depreciation" shall mean, for each Fiscal Year or part thereof, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year or part thereof, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes, the depreciation, amortization or other cost recovery deduction for such Fiscal Year or part thereof shall be an amount which bears the same ratio to such Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or part thereof bears to such beginning adjusted tax basis; provided, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or part thereof is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected in good faith by the Board of Managers.

"Dissolution" shall mean the commencement of proceedings with respect to the dissolution of the Company upon the happening of any of the events set forth in **Section 10.1**.

"Distribution" shall mean any money and the Fair Market Value of any property (net of liabilities secured by such property that the Member is deemed to assume or take pursuant to Section 752 of the

22725334

Code) distributed by the Company to the Members in accordance with ARTICLE VIII or ARTICLE XI of this Agreement.

"Effective Date" shall have the meaning set forth in the introductory paragraph to this Agreement.

"Fair Market Value" shall mean, with respect to any property, the value that would be obtained in an arm's length transaction for ownership of such property for cash between an informed and willing seller and an informed and willing purchaser, each with an adequate understanding of the facts and under no compulsion to buy or sell. Except as otherwise provided in this Agreement, the determination of the Fair Market Value of any property shall be determined in good faith by the Board of Managers.

"Family Members" shall have the meaning set forth in **Section 13.1(c)**.

"Fiscal Year" shall mean the fiscal and taxable year of the Company, which shall be the year ending December 31 unless another period is required by the Code.

"Gross Asset Value" shall mean, with respect to any asset of the Company, the adjusted basis of such asset as of the relevant date for federal income tax purposes, except as follows:

(a)     the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the Fair Market Value of such asset on the date of contribution;

(b)     the Gross Asset Value shall be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that the depreciation deduction taken into account each Fiscal Year for purposes of adjusting the Gross Asset Value of an asset shall be the amount of Depreciation with respect to such asset taken into account for purposes of computing Net Profits or Net Loss for the Fiscal Year;

(c)     the Gross Asset Value of any asset distributed to a Member by the Company shall be such asset's gross Fair Market Value (as determined by the Board of Managers) at the time of such distribution; and

(d)     upon election by the Board of Managers, the Gross Asset Values of all Company assets (including intangible assets such as goodwill) shall be adjusted to equal their respective Fair Market Values upon the events and in the manner specified in Regulations Section 1.704-1(b)(2)(iv)(f).

The foregoing definition of Gross Asset Value is intended to comply with the provisions of Section 1.704-1(b)(2)(iv) of the Regulations and shall be interpreted and applied consistently therewith.

"Indemnified Party" shall have the meaning set forth in **Section 9.1**.

"Indemnification Obligations" shall have the meaning set forth in **Section 9.1**.

"Involuntary Transfer" means any involuntary transfer, proceeding or action by or in which a Member shall be deprived or divested of any right, title or interest in or to any Membership Interest in whole or in part, including, without limitation, (i) any seizure under levy of attachment or execution, (ii) any foreclosure upon a pledge of such Membership Interest, (iii) any transfer in connection with bankruptcy or other court proceeding to a debtor in possession, trustee in bankruptcy or receiver or other officer or agency or (iv) any transfer to a state or to a public officer or agency pursuant to any statute pertaining to escheat or abandoned property.

"Liquidation" shall mean a liquidation of the Company in accordance with **Section 11.1**.

"Majority in Interest" shall mean the affirmative vote or written consent of Members holding a majority of the voting power of the outstanding Units held by all Members.

"Member Minimum Gain" has the meaning ascribed to the term "partner nonrecourse debt minimum gain" in Regulations Section 1.704-2(i)(2).

"Membership Interest" shall mean all of the ownership interests of a Member in the Company (which shall be considered personal property for all purposes), consisting of (a) such Member's interests in Net Profits, Net Losses, and Distributions of the Company, as such interests shall be adjusted from time to time in accordance with the provisions hereof, (b) such Member's Capital Account, (c) such Member's rights to participate in management as provided herein or under the LLC Act and (d) such Member's other rights and privileges as herein provided.

"Net Profits" or "Net Loss" shall mean with respect to each Fiscal Year or other period, an amount equal to the Company's taxable income or tax loss, as the case may be, for such year or period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a)(1) shall be included in such taxable income or loss), together with the following adjustments:

(a)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Loss pursuant to any other provision of this definition shall be added to such taxable income or tax loss;

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Loss pursuant to this definition shall be subtracted from such taxable income or tax loss in the year paid;

(c)     in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing the taxable income or loss, there will be taken into account Depreciation;

(d)     in the event the Gross Asset Value of any Company property is adjusted pursuant to subparagraph (d) of the definition of "Gross Asset Value" above, (i) the amount of such adjustment shall be taken into account as a gain or loss on the disposition of such property for purposes of computing Net Profits and Net Loss, and (ii) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of Depreciation herein;

(e)     gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property may differ from its Gross Asset Value; and

(f)     notwithstanding any other provision of this definition of Net Profits and Net Loss, any items comprising the Company's Net Profits or Net Loss that are specially allocated or that are allocated pursuant to **Section 7.3** shall not be taken into account in computing Net Profits or Net Loss.

"Nonrecourse Liability" shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

"Officer" shall mean any officer of the Company appointed pursuant to **Section 4.3(a)**.

"Percentage" shall mean, as to a Member, the percentage represented by (x) the number of outstanding Units held by such Member divided by (y) the total number of Units outstanding.

5

"Permitted Transferee" shall have the meaning set forth in **Section 13.1(c)**.

"Person" shall mean any individual, corporation, limited liability company, partnership, trust or unincorporated organization, or governmental authority or any agency or political subdivision thereof or other entity.

"Regulations" shall mean the Treasury Regulations (including temporary regulations or proposed regulations that may be relied upon or that have retroactive effect) promulgated and in effect under the Code, as amended from time to time (including corresponding provisions of succeeding regulations).

"Regulatory Allocations" shall have the meaning set forth in **Section 7.3(f)**.

"Section 704(b) Regulations" shall have the meaning set forth in **Section 7.1**.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

"Transfer" shall mean, when used as a noun, any sale, hypothecation, pledge, assignment, attachment, disposal, loan, gift, levy or other transfer, and, when used as a verb, to sell, hypothecate, pledge, assign, attach, dispose, loan, gift, levy or otherwise transfer.

"Unit" shall mean a unit of Membership Interest attributed to a Member pursuant to the terms of this Agreement and shall include all of the Common Units.

"Voluntary Withdrawal" shall mean a Member's resignation from the Company, which shall only be effective in accordance with **Section 3.8**.

"Voting Agreement" shall mean the Voting Agreement entered into as of the date hereof, by the parties hereto, as it may be amended from time to time.

## ARTICLE II

### ORGANIZATION

**Section 2.1** <u>Formation</u>. The Company was formed as a Delaware limited liability company on or about the date hereof. The rights and obligations of the Members shall be governed by this Agreement and the Act. If there is a conflict between the provisions of this Agreement and the Act, the provisions of the Act shall control (it being understood, however, that if the Act provides for a particular rule but allows the members of a limited liability company to provide to the contrary in their operating agreement, and if the parties hereto have so provided hereunder, then such provisions shall not be deemed to constitute a conflict for purposes of the foregoing). The Members shall cause the execution, delivery and filing of any necessary or advisable amendments or restatements to the Certificate of Formation consistent with the terms of this Agreement, and any other certificates, notices, statements or other instruments (and any amendments or statements thereof) necessary or advisable for the operation of the Company in all jurisdictions where the Company may elect to do business.

**Section 2.2** <u>Name</u>. The name of the Company is **[NewCo, LLC 2015]**. The business of the Company will be conducted under such name or such other trade names or fictitious names as may be adopted by the Company.

**Section 2.3** <u>Term</u>. The term of the Company shall continue indefinitely until the date that the Company is dissolved as hereinafter provided.

6

22725334

**Section 2.4**     Principal Office. The principal office, place of business and address of the Company shall be determined by the Board of Managers from time to time. The Company may have such other offices as the Board of Managers shall determine.

**Section 2.5**     Registered Agent and Office. The Company's registered agent and office shall be such agent and/or office as the Board of Managers may designate from time to time.

**Section 2.6**     Business. The business of the Company shall be to **[Describe]** and otherwise engage in any lawful activity for which limited liability companies may be organized under the Act.

**Section 2.7**     Powers. The Company shall have all the powers permitted to a limited liability company under the Act and which are necessary, convenient or advisable in order for it to conduct its business.

**Section 2.8**     Title to Company Assets. Title to, and all right and interest in, the Company's assets shall be acquired in the name of and held by the Company and no Member shall have any interest in any specific Company property or assets.

## ARTICLE III

## MEMBERS; CAPITAL CONTRIBUTIONS; UNITS

**Section 3.1**     Names and Addresses. The names and addresses of the Members are as set forth in **Exhibit A** to this Agreement. The Board of Managers shall update **Exhibit A** from time to time, as necessary, including in order to reflect the admission of Members and the Transfer or issuance of Units, each in accordance with the terms of this Agreement. Amendments or revisions of **Exhibit A** made in accordance with this Agreement shall not be deemed to be amendments to this Agreement requiring the consent or approval set forth in **Section 14.14**. Any reference in this Agreement to **Exhibit A** shall be deemed a reference to **Exhibit A** as amended and in effect from time to time.

**Section 3.2**     Capital Contributions. As of the Effective Date, the Members will make a Capital Contribution set forth opposite their respective names in **Exhibit A** and hold the number and of Common Units set forth opposite their respective names on **Exhibit A**.

**Section 3.3     [Additional Contributions. No Member shall be required to make any additional Capital Contributions or lend any funds to the Company. In addition, the Members hereby agree that, subject to Section 4.4(b), the Company may accept additional Capital Contributions and/or admit new Members pursuant to the provisions of Section 3.7.]**

**Section 3.4**     Withdrawal of Capital. No Member will be entitled to withdraw all or any part of such Member's Capital Contribution or Capital Account from the Company prior to the Company's Dissolution and Liquidation except as provided in **Article VIII**. In the event of any Distribution, no Member shall be entitled to demand such Distribution in the form of property other than money.

**Section 3.5**     No Interest on Capital. No Member will be entitled to receive interest on such Member's Capital Account or any Capital Contribution.

**Section 3.6**     Classes of Units. There shall be one class of Units designated as Common Units. The Company is authorized to issue up to **[12,500,000]** Common Units.

**Section 3.7**     Admission of Members. Except with respect to Permitted Transferees that are automatically admitted as members pursuant to **Section 13.1(c)**, a Person may be admitted as a Member after the date of this Agreement only upon the approval of the Board of Managers and a Majority in Interest.

7

22725334

**Section 3.8**     Voluntary Withdrawal.  No Member may withdraw or resign from the Company except with the approval of the Board of Managers.

**Section 3.9     [Outside Business.**

**Except as otherwise specifically provided in a written agreement between the Company, any Member or Board Member may engage in or possess an interest in other business ventures of any nature or description, independently or with others.][This needs discussion]**

**Section 3.10**     Indebtedness.  Subject to compliance with required consent requirements of **Section 4.4,** the Board of Managers may cause the Company to borrow funds and to encumber the assets of the Company as security therefor.

**Section 3.11**     Banking; Deposits.  All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Board of Managers.  Any Officers designated by the Board of Managers, acting alone, are authorized to establish accounts, endorse checks, drafts and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts.  All checks, withdrawals, drafts and other instruments obligating the Company to pay money in the ordinary course of business may be signed by such Officers as are designated by the Board of Managers from time to time (including specifically the Officers designated in **Section 4.3** below unless and until otherwise determined by the Board of Managers), and such Officers may execute any documents and take such other actions as may be requested by any bank for purposes of establishing such account.

**Section 3.12**     Representation and Warranties.  Each Member hereby represents and warrants to the Company and each other Member that: (a) it has full organizational power to execute and agree to this Agreement and to perform its obligations hereunder and this Agreement is a valid and binding obligation of such Member, enforceable against such Member in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws relating to the enforcement of creditors' rights generally and by general principles of equity; (b) the Member is acquiring its Units for the Member's own account as an investment and without an intent to distribute the Units in violation of applicable securities laws; and (c) the Member acknowledges that the Units have not been, and may never be, registered under the Securities Act or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.

## ARTICLE IV

## MANAGEMENT

**Section 4.1**     Management and Control.  The day-to-day business and affairs of the Company shall be operated and managed by the Board of Managers.  Except as otherwise set forth in this Agreement, the Board of Managers, and any Officer acting pursuant to authority granted by the Board of Managers, is authorized to take any actions, to make any determinations and to provide any consents permitted to be taken, made or provided by the Company under this Agreement or in furtherance of the Company's business.  No Officer or Member, other than the Board of Managers (subject to the terms of this Agreement), shall, acting individually, have the power to sign or bind the Company unless duly authorized to do so by the Board of Managers.

**Section 4.2**     Board of Managers.

(a)     Appointment.  The business and affairs of the Company shall be managed under the direction of a Board of Managers (the "Board of Managers") comprised of two persons (a "Board Member" or "Board Manager").  The initial Board Members shall be **[Gail Becker and Kim Holstein]**.

(b)     Indemnification.  The Company shall indemnify the Board Members to the fullest extent permitted by law and as set forth in **Article IX**.

(c)     Removal, Resignations, Death, Incapacity.  Each Board Member shall serve on the Board of Managers until such Board Member's resignation, removal, death or incapacity.

(i)     Removal.  Any Board Member may be removed as a Board Member at any time by a Majority in Interest but only in accordance with the terms of the Voting Agreement.

(ii)     Resignation.  Any Board Member may resign as a Board Member at any time by giving written notice to the Board of Managers.  Such resignation shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice.

(iii)     Replacement.  Upon the resignation or removal of a Board Member, or upon a Board Member's death or incapacity or any increase in the size of the Board of Managers, a replacement Board Member shall be designated or elected by a Majority in Interest but only in accordance with the terms of the Voting Agreement.

(d)     Voting.  Each Board Member shall have one vote in any decision of the Board of Managers.  The Board Members may participate in a meeting of the Board of Managers by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear or otherwise interactively communicate with each other, and such participation shall constitute presence in person at such meeting.  Any action which may be taken at a meeting of the Board of Managers may be taken without a meeting if all Board Members entitled to vote thereon consent thereto in writing.  In any instance in which the approval of the Board of Managers is required under this Agreement, such approval may be obtained in any manner permitted by the Act.

(e)     Meetings.  Meetings of the Board of Managers may be called by any Board Member.  All meetings shall be held upon reasonable notice to all Board Members.  Notice of a meeting need not be given to any Board Member who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting in writing, prior to its commencement, the lack of notice to such Board Member.  All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting.  The presence of a majority of the Board Members shall constitute a quorum for the transaction of business, and, unless otherwise expressly set forth herein, the affirmative vote or approval of a majority of the voting power of Board Members constituting such quorum shall constitute valid approval.

(f)     Expenses.  The Company shall reimburse Board Members for reasonable out-of-pocket expenses incurred in connection with attendance at meetings of the Board of Managers.

**Section 4.3**     Officers.

(a)     Appointment and Removal.  The officers of the Company (each, an "Officer") shall be designated and may be removed by the Board of Managers, subject to the terms set forth in any written employment agreement with the Company, and the Board of Managers shall, in its discretion, designate the titles and duties of such officers.  The initial Officers of the Company shall be:

9

| Officer | Title |
|---|---|
| Gail Becker | _____ |
| Kim Holstein | _____ |

(b)  <u>Responsibility and Authority</u>.  The Officers shall have responsibility for overall management of the Company and the authority to act on behalf of the Company, subject to the terms and conditions of this Agreement and the authority of the Board of Managers in accordance with this Agreement.

(c)  <u>Reliance of Third Parties</u>.  Any Person dealing with the Company may rely on a certificate signed by an Officer: (i) as to the identity of the Members hereunder; (ii) as to the existence or nonexistence of any fact or facts which constitute conditions precedent to acts by the Members or in any other manner germane to the affairs of the Company; (iii) as to who is authorized to execute and deliver any instrument or document on behalf of the Company; (iv) as to the authenticity of any copy of this Agreement and any amendments hereto; or (v) as to the authority of the Board of Managers, any Officer or the Tax Matters Member to act.

**Section 4.4**  <u>Board of Managers Decisions</u>.  Notwithstanding anything else to the contrary contained herein, neither the Company nor any subsidiaries of the Company shall, without the prior approval (either at a meeting duly noticed and held, or pursuant to an action by written consent) of the Board of Managers:

(a)  create or grant a security interest, lien or other encumbrance on the Company's assets (other than equipment leases secured by such equipment);

(b)  purchase or sell any material property of the Company;

(c)  issue any additional Units or any options, warrants or other rights to acquire any Units, or amend, modify, create or adopt any equity incentive plan;

(d)  make any Distributions or redeem, purchase or otherwise acquire any Units;

(e)  cause the Dissolution or Liquidation of the Company, or voluntarily cause the Company to commence Bankruptcy;

(f)  cause or permit the consummation of any other Change of Control; or

(g)  cause or permit the conversion of the Company into another form of business entity.

**Section 4.5**  <u>Member Decisions</u>.  Notwithstanding anything else to the contrary contained herein, neither the Company nor the Board of Managers shall, without the affirmative vote or written consent of Members holding a Majority in Interest:

(a)  amend, alter or repeal this Agreement or the Certificate of Formation;

(b)  cause or permit the Liquidation or Dissolution of the Company, or voluntarily cause the Company to commence Bankruptcy;

10

22725334

      (c)    cause a Change of Control;

      (d)    cause or permit the conversion of the Company into another form of business entity.

**Section 4.6**    <u>Action by Written Consent</u>. Except as otherwise specifically provided for elsewhere in this Agreement, any action which may be taken at a meeting of the Members, as the case may be, may be taken without a meeting if Members casting votes sufficient to approve such action consent thereto in writing. Following any such action by written consent, the Company shall provide notice of such action to all other Members of the class so acting.

**Section 4.7**    <u>Voting Rights</u>. Common Units shall have one vote per Unit.

**Section 4.8**    **[Buy/Sell Procedure.**

      **(a)**    **Either Gail Becker, on the one hand, or Kim Holstein, on the other, after the occurrence of Deadlock [to be defined] may provide written notice to the other party and the Company that it is electing to either have the other party purchase all of the Units held by her at a per Unit price equal to the Fair Market Value of all of the outstanding Units on the date of such notice divided by the total number of outstanding Units on such date. A party providing such notice is referred to as the "Initiating Party" and the other party is referred to as the "Responding Party."**

      **(b)**    **Within twenty (20) days after the date of the Initiating Party's written notice, the Initiating Party and the Responding Party shall meet and attempt to agree upon the Fair Market Value of all of the outstanding Units. If the parties cannot agree upon the Fair Market Value of the Property of all of the outstanding Units, such values will be determined by Appraisal.**

      **(c)**    **Within fifteen (15) days after Fair Market Value all of the outstanding Units is determined in accordance with this Agreement, the Responding Party shall notify the Initiating Party in writing whether it elects to purchase the Initiating Party's Units. If the Responding Party does not provide such notice with the specified time period, the Responding Party shall be deemed to have agreed to sell her Units to the Initiating Party under the terms specified in (d) below.**

      **(d)**    **If the Responding Party notifies the Initiating Party that it desires to purchase the Initiating Party's Units, the Responding Party shall complete the repurchase of the Units of the Initiating Party within twenty (20) days after the date of such notification by delivering to the Initiating Party a cash down payment equal to seventeen and one half percent (17.5%) of the Fair Market Value of the purchased Units, together with a promissory note for the balance, payable in equal quarterly installments over five (5) years commencing three months after the payment of the down payment and bearing interest at a rate that is the lesser of (i) the prime rate plus two percent (2%) and (ii) eight percent (8%). The prime rate shall mean the rate of interest per annum published on the first business day of each month in the Western Edition of the Wall Street Journal as the "prime rate." The promissory note shall be secured by a pledge of the purchased Units.]**

# ARTICLE V

## MEETINGS OF MEMBERS

**Section 5.1**    <u>Meetings of Members</u>. Meetings of the Members shall be held at such times and places as the Board of Managers fixes from time to time. No annual, regular or special meetings of Members are required, but if such meetings are held, they shall be noticed, held and conducted pursuant

to the LLC Act. Members may participate in any meeting through the use of conference telephones or similar communications equipment as long as all Members participating can hear one another or otherwise interactively communicate with each other. A Member so participating is deemed to be present in person at the meeting. Any action which may be taken by the Members at a meeting may also be taken without a meeting, if a consent in writing setting forth the action so taken is signed by Members having not less than the minimum votes that would be necessary to authorize that action at a meeting of the Members duly called and noticed.

## ARTICLE VI

### BOOKS AND RECORDS; RIGHT OF INSPECTION; TAX MATTERS

**Section 6.1**      Books and Records. There shall be maintained and kept at all times during the continuation of the Company, proper and usual books of account which shall accurately reflect the condition of the Company and shall account for all matters concerning the management thereof, which books shall be maintained and kept at the principal office of the Company or at such other place or places as the Board of Managers may from time to time determine. The Company's books and records shall be maintained on the basis selected by the Board of Managers.

**Section 6.2**      Information. Each Member has the right to obtain from the Company: (i) a current list of each Member, Board Member and Officer; and (ii) a copy of the Certificate of Formation and of this Agreement.

**Section 6.3**      Tax Returns. The Company, at its expense, will cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required state and local tax returns in each jurisdiction in which the Company is required to file tax returns. The Company will provide each Member, within 90 days after the end of each Fiscal Year, or as soon as practicable thereafter, a copy of the Company's informational federal income tax return for such Fiscal Year and such other information as is reasonably necessary to enable the Members to comply with their tax reporting requirements.

**Section 6.4**      Tax Elections. The Company shall make and revoke such tax elections as the Board of Managers shall approve from time to time. In addition, if, during the taxable year, any Member transfers all or any portion of its Units, by sale, exchange or Voluntary Withdrawal (to the extent permitted), then, upon the timely written request of the transferee, the Board of Managers may elect, pursuant to Section 754 of the Code, to adjust the basis of the Company property as permitted by Sections 734 and 743 of the Code. The election shall be filed with the Company's income tax return for the first Fiscal Year to which the election applies.

**Section 6.5**      Tax Matters Member.

(a)      _____ shall be the initial tax matters partner (the "Tax Matters Member") under Section 6231(a)(7) of the Code. Each of the Members hereby consents to such designation and agrees to take any such further action as may be required by the Regulations or otherwise to effectuate such designation. The Board of Managers may from time to time direct the actions of, or replace, the Tax Matters Member.

(b)      The Tax Matters Member shall represent the Company in connection with all examinations of the Company's affairs by any tax authorities, including resulting judicial and administrative proceedings, at the Company's expense. Each Member agrees, and each holder of Units who is not a Member shall be deemed by virtue of its ownership of Units to agree, that it will furnish the Tax Matters Member with such information as the Tax Matters Member may reasonably request in order to allow the Tax Matters Member to provide the Internal Revenue Service or other taxing authority with

12

sufficient information with respect to any such proceedings. The decisions of the Tax Matters Member shall be final and binding as to all Members except to the extent that any Member files a statement not to be bound by a settlement pursuant to Code Section 6224(c)(3). Notwithstanding the foregoing, (i) the Tax Matters Member will give the other Member (or a designated representative of the other Member) prior notice of all telephonic or other meetings with the Internal Revenue Service or any other taxing authority, (ii) the other Member (or a designated representative of the other Member) shall have the right to attend such meetings, (iii) the Tax Matters Member shall not make any election or decision under the Code or make any statement, filing or agreement with the Internal Revenue Service or any other taxing authority without the prior approval of the other Member, and (d) in any proceeding the Tax Matters Member shall furnish to the other Member a copy of all notices or other written communications received by the Tax Matters Member from the Internal Revenue Service or other taxing authority (except such notices or communications that are sent directly to the Members).

**Section 6.6** <u>Partnership for Tax Purposes Only</u>. The classification of the Company as a partnership will apply only for tax purposes, and the Company will not make an election to be treated as other than a partnership for tax purposes. No Member, Officer or agent of the Company shall take or permit any action that could cause the Company to be treated as other than a partnership for tax purposes. This characterization, solely for tax purposes, does not create or imply a general partnership among the Members for state law or any other purpose. Instead, the Members acknowledge the status of the Company as a limited liability company formed under the LLC Act.

# ARTICLE VII

## CAPITAL ACCOUNTS; ALLOCATIONS

**Section 7.1** <u>Maintenance</u>. A single capital account (each a "<u>Capital Account</u>") will be established and maintained for each Member and will be credited, charged and otherwise adjusted as provided in this **ARTICLE VII** and as required by the regulations promulgated under Section 704(b) of the Code (the "<u>Section 704(b) Regulations</u>"). The Capital Account of each Member will be:

      (a) credited with (i) each Capital Contribution made by such Member, (ii) such Member's allocable share of Net Profits and other items of income or gain, and (iii) all other items properly credited to the Capital Account of such Member as required by the Section 704(b) Regulations; and

      (b) charged with (i) each Distribution made to such Member by the Company, (ii) such Member's allocable share of Net Losses and other items of deduction or loss, and (iii) all other items properly charged to the Capital Account of such Member as required by the Section 704(b) Regulations.

**Section 7.2**

      Subject to **Section 7.3**, the Net Profits or Net Loss for each Fiscal Year of the Company shall be allocated to the Members in such a manner that, at the end of such Fiscal Year, the Adjusted Capital Account balance of each Member shall, to the extent possible, equal the amount which would have been distributed to such Member pursuant to a Hypothetical Liquidation as of the end of the last day of such Fiscal Year. For this purpose, a "<u>Hypothetical Liquidation</u>" means that all assets of the Company are disposed of in a taxable disposition for the Gross Asset Value of such assets, the debts of the Company are paid according to their terms (limited in the case of each Nonrecourse Liability to the Gross Asset Value of the assets securing such liability), and the remaining amounts are distributed to the Members pursuant to **Section 11.2**. If for any Fiscal Year, such an allocation of Net Profits or Net Loss does not permit the Adjusted Capital Accounts of the Members to be made to equal the amount which would have been distributed to the Members pursuant to a Hypothetical Liquidation as of the end of the

13

last day of such Fiscal Year, individual items of gross income, gain, loss or deduction (which were the components of Net Profits or Net Loss) shall be allocated among the Members in such a manner that, at the end of such Fiscal Year, the Adjusted Capital Account of each Member shall, to the extent possible, equal the amount which would have been distributed to such Member pursuant to a Hypothetical Liquidation as of the end of the last day of such Fiscal Year.

Section 7.3    Regulatory Allocations.

(a)    Notwithstanding any other provision of this Agreement, Net Losses (or items of deduction as computed for book purposes) shall not be allocated to a Member to the extent that the Member has or would have, as a result of such allocation, a deficit Adjusted Capital Account. Any Net Loss (or items of deduction as computed for book purposes) which otherwise would be allocated to a Member, but which cannot be allocated to such Member because of the application of the immediately preceding sentence, shall instead be allocated to the other Members, subject to the limitation imposed by the immediately preceding sentence.

(b)    In order to comply with the "qualified income offset" requirement of the Regulations under Code Section 704(b), and notwithstanding any other provision of this Agreement to the contrary, except **Section 7.3(c)**, if any Member unexpectedly receives any adjustment, allocation or distribution described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which results in a deficit Adjusted Capital Account balance for the Member, such Member shall be allocated items of income and book gain in an amount and manner sufficient to eliminate such deficit as quickly as possible; provided, that an allocation pursuant to this Section 7.3(b) shall be made if and only to the extent that such Member would have a deficit Adjusted Capital Account balance after all other allocations provided in this Article VII have been tentatively made as if this Section 7.3(b) were not in the Agreement.

(c)    In order to comply with the "minimum gain chargeback" requirements of Regulations Section 1.704-2(f)(1) and Section 1.704-2(i)(4), and notwithstanding any other provision of this Agreement to the contrary, in the event there is a net decrease in a Member's share of Company Minimum Gain (as determined pursuant to Regulations Section 1.704-2(d)(1)) and/or Member Minimum Gain (as determined pursuant to Regulations Section 1.704-2(i)(2)) during a Company taxable year, such Member shall be allocated items of income and gain for that year (and if necessary, for other years) as required by and in accordance with Regulations Section 1.704-2(f)(1) and Section 1.704-2(i)(4) before any other allocation is made.

(d)    Notwithstanding any other provision of this Agreement, all items of deduction and loss that, pursuant to Regulations Section 1.704-2(i), are attributable to a nonrecourse debt for which a Member (or a Person related to such Member under Regulations Section 1.752-4(b)) bears the "economic risk of loss" (within the meaning of Regulations Section 1.752-2) shall be allocated to such Member as required by Regulations Section 1.704-2(i).

(e)    Any "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in accordance with the percentage of outstanding Units held by each Member.

(f)    The allocations set forth in this **Section 7.3** (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of taxable income or tax loss. Therefore, notwithstanding any other provision of this **ARTICLE VII** (other than the Regulatory Allocations), offsetting special allocations of taxable income or tax loss, shall be made in whatever manner the Board of Managers (or, if the Board of Managers shall fail to act in a timely fashion in a circumstance that requires action, the Officers) reasonably shall deem appropriate, so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such

14

Member would have had if the Regulatory Allocations were not part of the Agreement. In making such offsetting allocations, there shall be taken into account future Regulatory Allocations that, although not yet made, are likely to offset other Regulatory Allocations previously made.

(g)     If the number of Units held by the Members change during a year, Net Profits or Net Loss for such year shall be allocated among the Members on the basis of the computation method which in the reasonable discretion of the Board of Managers is in the best interests of the Company, provided that such method is in conformity with the methods prescribed by Code Section 706 and Regulations Section 1.706-1(c)(2)(ii). Any transferee of Units shall succeed to the Capital Account of the transferor Member to the extent it relates to the transferred interest.

**Section 7.4**    Tax Allocation Rules.

(a)     Except as otherwise provided in this **Section 7.4**, all items of income, gain, loss deduction or credit for federal, state and local income tax purposes will be allocated in the same manner as the corresponding "book" items are allocated under **Sections 7.2** (as a component of Net Profits or Net Loss), or **7.3**.

(b)     Income, gain, loss and deductions of the Company shall, solely for income tax purposes, be allocated among the Members in accordance with Code Section 704(c) so as to take account of any difference between the adjusted basis of the assets of the Company for federal income tax purposes and their respective Gross Asset Values. Any allocations required by Code Section 704(c) shall be effectuated using such method described in Regulations Section 1.704-3, as may be chosen by the Board of Managers.

(c)     In the event the Company has in effect an election under Section 754 of the Code, allocations of income, gain, loss deduction or credit to affected Members for federal, state and local tax purposes will take into account the effect of such election pursuant to applicable provisions of the Code.

(d)     Allocations pursuant to this **Section 7.4** are solely for federal, state and local tax purposes, and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Loss, other items or distributions pursuant to any provision of this Agreement.

# ARTICLE VIII

## DISTRIBUTIONS AND ACCOUNTING METHOD

**Section 8.1**    Distributions.  All Distributions of Available Cash, other than in connection with a Liquidation or Change of Control pursuant to **Article XI**, shall be made in such amounts and at such times as the Board of Managers shall determine, to the holders of Units pro rata, based on the number of such Units held.

**Section 8.2**    Withholding.

(a)     If required by the Code or by state, local or foreign law, the Company will withhold any required amount from Distributions, or with respect to amounts allocated or items specially allocated, to a Member for payment to the appropriate taxing authority. Any amount so withheld from a Member will be treated as a Distribution by the Company to such Member. Each Member agrees to timely file any document that is required by any taxing authority in order to avoid or reduce any withholding obligation that would otherwise be imposed on the Company.

15

(b)     To the extent any amount is required to be withheld with respect to a Member and paid over to an appropriate taxing authority which amount is in excess of the amounts otherwise distributable at such time to such Member in respect of such withholding, such excess amounts paid to the taxing authority in respect of such withholding shall be treated as a loan to such Member that is payable on demand.

**Section 8.3**     Offset.  The Company may offset all amounts owing to the Company by a Member against any Distribution to be made to such Member in the discretion of the Board of Managers.

**Section 8.4**     Limitation Upon Distributions.  No Distribution shall be paid to the extent that, at the time of the Distribution, after giving effect to the Distribution, all liabilities of the Company (other than liabilities to Members on account of their interest in the Company and liabilities for which recourse of creditors is limited to specified property of the Company) exceed the Fair Market Value of the assets of the Company (except that the Fair Market Value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the Company only to the extent that the Fair Market Value of such property exceeds such liability).

**Section 8.5**     Accounting Method.  For income tax and financial accounting purposes, the Company will use the method of accounting determined by the Board of Managers.

# ARTICLE IX

# INDEMNIFICATION

**Section 9.1**     Indemnification by Company.  Any Person who was or is a Member, Board Member, Officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a board member, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise (collectively, the "Indemnified Party") shall, in accordance with this **ARTICLE IX**, be indemnified and held harmless by the Company from and against any and all losses, claims, damages, liabilities, expenses (including reasonable legal and other professional fees and disbursements), judgments, fines, settlements, and other amounts incurred (collectively, the "Indemnification Obligations") in connection with any and all claims, demands, actions, suits or proceedings (civil, criminal, administrative or investigative), actual or threatened, in which such Indemnified Party may be involved, as a party or otherwise, by reason of such Indemnified Party's service to, or on behalf of, or management of the affairs of, the Company or, at the request of the Company, with respect to another limited liability company, corporation, partnership, joint venture, trust or other enterprise, or rendering of advice or consultation with respect thereto, whether or not the Indemnified Party continues to be serving in the above-described capacity at the time any such Indemnification Obligation is paid or incurred.  Notwithstanding the foregoing, no indemnification shall be provided by the Company with respect to any Indemnification Obligation that resulted from action or inaction of such Indemnified Party that, in each case, constituted gross negligence, willful misconduct, a material breach of the Indemnified Party's fiduciary duty or duty of loyalty to the Company, or an act (a) that was not in good faith, (b) that involved a knowing violation of law, or (c) from which the Indemnified Party derived an improper personal benefit, in each case as ultimately determined by a court of competent jurisdiction, which determination is no longer appealable.  The Company shall also indemnify and hold harmless any Indemnified Party from and against any Indemnification Obligation suffered or sustained by such Indemnified Party by reason of any action or inaction of any employee, broker or other agent of such Indemnified Party, whether or not the Indemnified Party continues to be serving in the above-described capacity at the time any such Indemnification Obligation is paid or incurred, provided, that such employee, broker or agent was selected, engaged or retained by such Indemnified Party with reasonable care and acted in a manner such that such employee, broker or agent would be entitled to indemnification hereunder if such employee, broker or agent were an Indemnified Party.  The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not,

of itself, create a presumption that such Indemnification Obligation resulted from the gross negligence or willful misconduct of, breach by or failure to properly act of such Indemnified Party. Expenses (including reasonable legal and other professional fees and disbursements) incurred in any proceeding will be paid by the Company, as incurred, in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of such Indemnified Party to repay such amount if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified by the Company as authorized hereunder.

Section 9.2    Indemnification Not Exclusive. The indemnification provided by **Section 9.1** shall not be deemed to be exclusive of any other rights to which each Indemnified Party may be entitled under any agreement, or as a matter of law, or otherwise, both as to action in such Indemnified Party's official capacity and to action in another capacity, and shall continue as to such Indemnified Party who has ceased to have an official capacity for acts or omissions during such official capacity or otherwise when acting at the request of the Company, or any Person granted authority thereby, and shall inure to the benefit of the heirs, successors and administrators of such Indemnified Party.

Section 9.3    Insurance on Behalf of Indemnified Party. The Company shall have the power but not the obligation to purchase and maintain insurance on behalf of each Indemnified Party, at the expense of the Company, against any liability which may be asserted against or incurred by him in any such capacity, whether or not the Company would have the power to indemnify the Indemnified Parties against such liability under the provisions of this Agreement.

Section 9.4    No Agency. No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company. Accordingly, each Member shall indemnify, defend, and hold harmless each other Member and the Company from and against any and all loss, cost, expense, liability or damage arising from or out of any claim based upon any action by such Member in contravention of the first sentence of this **Section 9.4**. The foregoing indemnification by a Member shall not be deemed to be exclusive of any other rights to which the party indemnified thereby may be entitled under any agreement, or as a matter of law, or otherwise.

Section 9.5    Indemnification Limited by Law. Notwithstanding any of the foregoing to the contrary, the provisions of this **ARTICLE IX** shall not be construed so as to provide for any indemnification for any liability to the extent (but only to the extent) that such indemnification would be in violation of applicable law or that such liability may not be waived, modified or limited under applicable law, but shall be construed as to effectuate the provisions of this **ARTICLE IX** to the fullest extent permitted by law.

Section 9.6    Amendment of Agreement. The indemnification provided for in this **ARTICLE IX** shall apply as written here to acts or omissions occurring prior to any amendment of this Agreement, notwithstanding such amendment to this Agreement.

# ARTICLE X

## DISSOLUTION AND WITHDRAWAL

Section 10.1    Dissolution. Dissolution of the Company will occur only upon (a) the approval of the Board of Managers and a Members holding a Majority in Interest in accordance with **Sections 4.4** and **4.5** respectively and (b) the happening of any of the following events: (i) the sale of all or substantially all of the Company's assets; or (iii) the entry of a decree of judicial dissolution under the LLC Act.

Section 10.2    Withdrawal of a Member.

17

(a)     No Member shall have the right or power to Voluntarily Withdraw from the Company, except as permitted by **Section 3.8**.

(b)  ·  Immediately upon the Bankruptcy of a Member, the successor of the Member, if applicable, shall thereupon become an assignee but not have the right to vote or exercise any other rights of a Member unless admitted as a Member pursuant to the terms of this Agreement.

## ARTICLE XI

## LIQUIDATION

**Section 11.1**     Liquidation.  Upon Dissolution of the Company, the Company will immediately proceed to wind up its affairs and liquidate (a "Liquidation").  The Liquidation of the Company will be accomplished in a businesslike manner by the Officers and Board of Managers, who shall be entitled to reasonable compensation therefor in an amount not exceeding that which would be agreed upon by independent third parties at arm's length.  A reasonable time will be allowed for the orderly Liquidation of the Company and the discharge of liabilities to creditors so as to enable the Company to minimize any losses attendant upon Liquidation.  Any gain or loss on disposition of any Company assets in Liquidation will be allocated among the Members and credited or charged to Capital Accounts in accordance with the provisions of this Agreement.  Until the filing of the certificate of cancellation under **Section 11.4** and without affecting the liability of Members and without imposing liability on the liquidating trustee or the Officers, any Officer may settle and close the Company's business, prosecute and defend suits, dispose of its property, discharge or make provision for its liabilities, and make Distributions in accordance with the priorities set forth in **Section 11.2**.

**Section 11.2**     Priority of Payment.  The assets of the Company will be distributed in Liquidation, or upon a Distribution in connection with a Change of Control other than a Liquidation, in the following order:

(a)     To creditors, including Members who are creditors, by the payment or provision for payment of the debts and liabilities of the Company and the expenses of Liquidation (including payments to the Officers in accordance with **Section 11.1**);

(b)     To the setting up of any reserves that the Board of Managers determines in good faith is reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; and

(c)     After determining that all known debts and liabilities of the Company in the process of winding-up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the holders of Units pro-rata, based on the number of Units held.

Such liquidating Distributions shall be made by the end of the Company's taxable year in which the Company is liquidated or, if later, within 90 days after the date of such Liquidation.

**Section 11.3**     Liquidating Reports.  A report will be submitted with each liquidating Distribution to the Members, showing the collections, disbursements and Distributions during the period which is subsequent to any previous report.  A final report, showing cumulative collections, disbursements and Distributions, will be submitted upon completion of the Liquidation process.

**Section 11.4**     Certificate of Cancellation.  Within 90 days following the Dissolution of the Company and the commencement of winding up of its business, or at any other time there are no Members, on behalf of the Company, the Officers will file a certificate of cancellation (to cancel the

18

Certificate of Formation) and, if necessary, a certificate of dissolution with the Secretary of State of the State of Delaware pursuant to the LLC Act. At such time, the Company will also file an application for withdrawal of its certificate of authority in any jurisdiction where it is then qualified to do business.

**Section 11.5** <u>Deficit Capital Account</u>. Upon a liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, if any Member has a negative Capital Account (after giving effect to all contributions, Distributions, allocations and other adjustments for all Fiscal Years, including the Fiscal Year in which such liquidation occurs), the Member shall have no obligation to make any Capital Contribution, except as otherwise expressly required by the LLC Act, and the negative balance of any Capital Account shall not be considered a debt owed by the Member to the Company or to any other person for any purpose.

**Section 11.6** <u>Nonrecourse to Other Members</u>. If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return any Capital Contribution of any Member, such Member shall have no recourse against any other Member except for Distributions not made in accordance with the terms of this Agreement.

## ARTICLE XII

### CONVERSION

**Section 12.1** <u>Conversion to Corporation.</u> Upon approval by the Board of Managers and Members holding a Majority in Interest, the Company shall convert from a limited liability company to a corporation (the "Corporate Successor"). Such conversion may be effected by a contribution by the Members of all of the Units to the Corporate Successor in exchange for shares of such corporation, by merger with or into the Corporate Successor solely for the purpose of converting the Company from a limited liability company to a corporation, by transfer of Company assets to the Corporate Successor, by conversion under applicable conversion statutes or by other means. The outstanding equity capitalization of the Corporate Successor shall be distributed among Members in an equitable fashion as determined by the Board, and the Company and the Members shall enter into such other agreements (including stockholder agreements and the like) as are reasonably appropriate in connection therewith, as determined by the Board of Managers and Members holding a Majority in Interest. Upon the request of the Board of Managers and Members holding a Majority in Interest, each Member agrees to vote its Units in support of such conversion, and to enter such agreements.

## ARTICLE XIII

### TRANSFER RESTRICTIONS AND RELATED RIGHTS

**Section 13.1** <u>Restrictions on Transfer of Units</u>. No Person shall directly or indirectly Transfer any Unit or any interest therein except as may be expressly permitted by this Agreement.

(a) Except as provided in Section 13.1(c), and subject to the other provisions of this **Article XIII**, a Person may not Transfer any Unit or any interest therein without the consent of (i) the Board of Managers, and (ii) Members holding a Majority in Interest.

(b) Notwithstanding anything in this Agreement to the contrary, no Unit or any interest therein may be Transferred unless the transferee executes and delivers to the Company (i) an instrument pursuant to which it agrees to be bound by the terms of this Agreement, and (ii) an Adoption Agreement (as defined in the Voting Agreement) in accordance with the terms of the Voting Agreement.

19

(c)    A Member may Transfer, without the consent required in Section 13.1(a), all or any of such Member's Units to a Member's Family Members (as hereinafter defined) and referred to as a "Permitted Disposition." For the purposes of this Section 13.1(c), the term "Family Members" shall include any child, parent or spouse, a trust for the benefit of the Member and/or the foregoing persons, and any other entity in which the foregoing persons own a controlling interest and in the case of a Member which is a trust a transfer by such trust in accordance with the terms of such trust so long as the beneficiaries of the trust are Family Members. A Permitted Transferee shall automatically become admitted as a Member with out further action by the Board of Managers or Members upon compliance with the requirements of **Section 13.1(b)**. Each of the assignees in this Section 13.1(c) shall be a "Permitted Transferee."

(d)    Notwithstanding anything in this Agreement to the contrary, no Transfer of Units shall be made if such Transfer, or the transferee's ownership of such Units, would:

(i)    result by itself, or in combination with any other previous Transfers, in (A) the termination of the Company as a partnership for federal income tax purposes, if such termination would, in the reasonable, good faith opinion of the Board of Managers, be detrimental to the Members or (B) the treatment of the Company as a "publicly traded partnership" taxable as a corporation for U.S. federal income tax purposes;

(ii)    result in the violation of the Securities Act, or any other applicable federal or state laws;

(iii)    be a violation of or a default (or an event that, with notice or the lapse of time or both, would constitute a default) under, or result in an acceleration of any indebtedness under, any note, mortgage, loan agreement or similar instrument or document to which the Company is a party; or

(iv)    be a Transfer to an individual who is not legally competent or who has not achieved his or her majority under the law of the applicable state (excluding trusts for the benefit of minors).

(e)    Notwithstanding anything in this Agreement to the contrary, no Transfer shall be permitted unless the Units to be Transferred are registered pursuant to the Securities Act and registered or qualified under applicable state law or Transferred in a transaction which is exempt from such registration and qualification. The Company may require an opinion of counsel, in a form reasonably acceptable to the Company, to the effect that such Transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, the cost of which opinion shall be borne by the transferor. The transfer restrictions contained herein are in addition to any transfer restrictions contained in any Restricted Unit Agreement between the Company and a Member.

The Company shall not transfer on its books any Unit, unless, in the reasonable opinion of counsel to the Company, there has been compliance with all of the material conditions hereof affecting such Unit and any such attempted Transfer in violation of this Agreement shall be void and of no effect.

**Section 13.2**    Repurchase of Units on Triggering Events.

(a)    Upon the occurrence of an Involuntary Transfer, the Company shall have, for a period of 180 days following the Company's receipt of notice of such Involuntary Transfer, the option to repurchase and redeem from such person or a successor thereof, all or part of such person's Membership Interest at Fair Market Value. The Company may assign such right at the discretion of the Board of Managers and at the discretion of the Board of Managers, and the price may be paid by the Company or the assignee with a three year promissory note bearing interest at the prime rate announced by Bank of

America from time to time. Such option may be exercised upon the election of the Board of Managers by written notice to affected person within the 180 day period set forth above.

Section 13.3    No Member Rights. No Member or holder of Units who is not a Member has the right or power to confer upon any transferee the attributes of a Member in the Company and no transferee of Units shall be admitted as a Member except as provided in this **ARTICLE XIII** and in compliance with **Section 3.7**.

Section 13.4    Transferee Rights. A transferee of Units who is not admitted as a Member in accordance with **Section 3.7** or **Section 13.1(c)** shall have no right (a) to participate or interfere in the management or administration of the Company's business or affairs or (b) to vote or agree on any matter affecting the Company or any Member. Unless otherwise provided for herein, the only rights of a transferee of Units who is not admitted as a Member in accordance with this Agreement is to receive the Distributions to which the transferor would otherwise be entitled (to the extent of the Units Transferred) when and as paid by the Company. However, each transferee of Units will be subject to all of the obligations, restrictions and other terms contained in this Agreement as if such transferee were a Member. To the extent of any Units Transferred, the transferor Member shall not possess any right or power as a Member or under the terms of this Agreement (other than as provided in this **Section 13.4**) and may not exercise any such right or power directly or indirectly on behalf of the transferee.

# ARTICLE XIV

## GENERAL PROVISIONS

Section 14.1    Waivers Generally. No delay in the exercise of any right will operate as a waiver of such right. No single or partial exercise of any right will preclude its further exercise. A waiver of any right on any one occasion will not be construed as a bar to, or waiver of, any such right on any other occasion.

Section 14.2    Equitable Relief. If any Member proposes to Transfer its Units in violation of the terms of this Agreement, the Company may apply to any court of competent jurisdiction for an injunctive order prohibiting such proposed Transfer except upon compliance with the terms of this Agreement, and the Company or any Member may institute and maintain any action or proceeding against the Person proposing to make such Transfer to compel the specific performance of this Agreement. Any attempted Transfer in violation of this Agreement is null and void, and of no force and effect. The Person against whom such action or proceeding is brought waives the claim or defense that an adequate remedy at law exists, and such Person will not urge in any such action or proceeding the claim or defense that such remedy at law exists.

Section 14.3    Remedies for Breach. The rights and remedies of the Members set forth in this Agreement are neither mutually exclusive nor exclusive of any right or remedy provided by law, in equity or otherwise. The Members agree that all legal remedies (such as monetary damages) as well as all equitable remedies (such as specific performance) will be available for any breach of any provision of this Agreement.

Section 14.4    Counterparts. This Agreement may be signed in multiple counterparts. Each counterpart will be considered an original, but all of them in the aggregate will constitute one instrument. Any signature hereto, or on any consent of the Board of Managers or Members, may be delivered by fax, email or other electronic means with the same effect as an original.

22725334

**Section 14.5**    Notices.  All notices under this Agreement will be in writing and will be delivered or sent to a Member at the address or fax number listed on **Exhibit A** hereto, or at such other address or fax number as a Member may give by notice to the Company and all other Members, with such copies to such parties as are indicated on **Exhibit A** hereto.  Any notices given to any Member in accordance with this Agreement will be deemed to have been duly given and received: (a) on the date of receipt if personally delivered, (b) five (5) days after being sent by mail, postage prepaid, (c) the date of receipt, if sent by registered or certified mail, postage prepaid, (d) when sent by confirmed facsimile or telecopier transmission (provided a confirming copy is sent by another means described herein), or (e) one (1) Business Day after having been sent by a recognized overnight courier service upon confirmation of delivery by such courier service.

**Section 14.6**    Date of Performance.  Whenever this Agreement provides for any action to be taken on a day which is not a Business Day, such action shall be taken on the next following Business Day.

**Section 14.7**    Partial Invalidity.  Wherever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law.  However, if for any reason any one or more of the provisions of this Agreement are held to be invalid, illegal or unenforceable in any respect, such action will not affect any other provision of this Agreement.  In such event this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained in it.

**Section 14.8**    Entire Agreement.  This Agreement contains the entire agreement among the Members with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the Members with respect thereto, whether or not relied or acted upon.

**Section 14.9**    Binding Effect.  This Agreement is binding upon, and inures to the benefit of, the Members and their permitted transferees, successors and assigns.

**Section 14.10**    Further Assurances.  Each Member agrees, without further consideration, to sign and deliver such other documents of further assurance as may reasonably be necessary to effectuate the provisions of this Agreement.

**Section 14.11**    Headings.  Article and Section titles have been inserted for convenience of reference only.  They are not intended to affect the meaning or interpretation of this Agreement.

**Section 14.12**    Terms.  Terms used with initial capital letters will have the meanings specified, applicable to both singular and plural forms, for all purposes of this Agreement.  All pronouns (and any variation) will be deemed to refer to the masculine, feminine or neuter, as the identity of the Person may require.  The singular or plural includes the other, as the context requires or permits.  The word "include" (and any variation) is used in an illustrative sense rather than in a limiting sense.  The word "day" means a calendar day, unless otherwise specified.

**Section 14.13**    Governing Law.  This Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware (without giving effect to any conflict of laws provisions).  Any conflict or apparent conflict between this Agreement and the LLC Act will be resolved in favor of this Agreement except as otherwise required by the Act.

**Section 14.14**    Amendments.  Amendments to this Agreement must be in writing and, except as set forth in **Section 3.1**, shall only be effective with the approval of Members holding a Majority in Interest.  Except as expressly set forth herein, any amendment so effected shall be binding upon all Members, holders of Units who are not members and Board Members.

**[Spousal Consent]**

22

**Section 14.15**   IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement as of the date first above written.

<div align="center">

**MEMBERS:**

</div>

 

 

                                        _____

                                        Gail Becker

 

 

                                        _____

                                        Kim Holstein

**EXHIBIT A**

**SCHEDULE OF MEMBERS**

| Members Name and Address | Initial Capital Contributions | Common Units | Percentage |
|---|---|---|---|
| Gail Becker | | 5,000,000 | 50% |
| Kim Holstein | | 5,000,000 | 50% |
| | | | |
| | | | |
| TOTAL | | 10,000,000 | 100% |

22725334

# EXHIBIT C

**Pattishall Engagement**



EXHIBIT C

Ms. Kim Holstein                       - 2 -                    January 15, 2016
Ms. Gail Becker

We will send bills for services and incurred disbursements on a monthly basis, usually within two or three weeks at the end of each month. All bills are payable upon receipt. From time to time, we may require advances of substantial anticipated disbursements or fees, or request that you pay disbursements directly.

If these terms of engagement are acceptable to you, please return a countersigned copy of this letter to me. If you have any questions, please call.

We look forward to working with you.

Best regards,

PB:lrb

ACKNOWLEDGED AND AGREED

By: _____
        Kim Holstein

Title: _____

Date: _____

By: _____
        Gail Becker

Title: _____Co-Founder_____

Date: _____1/19/2016_____

2

# EXHIBIT D

# Cauli-Power
## Agenda for Conversation 3/26/16:

### *Reflection on past months*

### Key Progress Points in past initial months-

-Research of competitive landscape, market potential
-R&D of launch product line and subsequent product lines
-Brainstorm and selection of agreed on company name and branded launch product line
-Engagement of IP firm: Intellectual property search and application
-Purchase of website domains in research of names
-Meetings and communications to move options forward with 1 potential co-packer (high possibility) and 1 source for additional co-packers, with a 3rd potential co-packer meeting scheduled for 3/28
-First in-person meetings 3/3/16 in Chicago and 3/11/16 in CA
-Initial meeting with design team on packaging/logo and their desire to be part of company
-Review of input forms for CauliPower logo/packaging design components
-Discussion of company set-up, B-corp vs. traditional LLC; initial talks with possible corporate lawyer
-Continued research of concept in relation to Expo West/hot trends and new products

### *Our current roles, desires for roles within the company, timing, steps/needs to launch, concerns, how we work together, barriers to moving forward, options to consider.*

### *Discussion of each of our strengths and weaknesses, goals for moving forward with success.*

Case: 1:25-cv-04501 Document #: 1 Filed: 04/23/25 Page 62 of 77 PageID #:62

**Kim: My Passions. My Dream for Cauli-Power. My Strengths. My Weaknesses.**

**My passion:** create, give birth to branded product line in natural foods channel that nourishes our world community; prepare for beyond successful launch; set up as B corp to walk the walk as a company with purpose. Also, huge passion to mentor, coach and inspire wanna-be entrepreneurs; I love the journey of a soulful entrepreneur, and want to help others build their dreams.

**My dream** for Cauli-Power: kids and adults of all ages will enjoy pizza, tater tots, mac 'n cheese, grilled cheese and more with the amazing nutrition-packed power of cauliflower! We can transform the experience of these otherwise "junky and adored" foods—and create a cauli-revolution!

**My strengths-** Brand Architect/ product development visionary with experience, 20+ years expertise in taking a food product from dream to reality with nationwide distribution and then sale to a public company, specific natural foods channels of distribution, product development, R&D, quality assurance, contacts, broker and food community networks, angel networks for growth funding, marketing vehicles, reputation with proven track of success; talent for taking niche product idea and developing multi-product line with integrated branding umbrella, cohesive packaging, birth of brand elements and culture, product with purpose, and powerful messaging for meaningful impact.

**My weaknesses-** In my role as a food product brand architect, I need team to help execute. I know my weaknesses and areas where I'm not the expert; my talent is to seek out experts to fill the gaps. Experts I seek include CFO/financial talent, legal expertise both in launch and building company, food science/lab expertise, retail

brokers for building distribution network, branding design talent, sales management team to build multiple channels of distribution, social media experts, champions for building blogger network and brand ambassador network for creating cauli-craze. Funding is critical to execute with success.

I also need income while giving birth to branded products, and am continuing to build my consulting and entrepreneurial coaching to support on the side. And, I currently still own Nourish Foods Group company; while I am looking for buyer to take Crave Bar brand, the company is my responsibility until an owner is secured. So time is a challenge, as well as resources. I have valuable launching and growth expertise for a natural products line; I do not have additional funding resources to contribute to CauliPower.

*For Gail,*

*What is your passion, your dream, your strengths and weaknesses? What are your areas you are able to contribute in building the dream?*

*What do you see as your role (s) with Cauli-Power? When you quit your job and dive into Cauli-Power, what do you see yourself doing? How soon do you want to quit your job? Do you envision yourself doing something on the side, or do you have the resources to work in Cauli-Power full-time?*

## My perspective on Initial steps for setting up a food company in natural channel (by Stage):

### Stage 1-

Viability of launch product—can it be made? Can it be made for a price that enables the company to make a profit?

Competitive evaluation- is anyone else making it? What are the competitive barriers?

Options for manufacturing- what is the best way to make the product—consideration of costs, expertise, time, risk, food regulations, cost of entry?

Distribution evaluation and product size market

### Stage 2

Review of manufacturing options... is co-packing the best choice?

Exploration of multiple options...who are the right-fit co-packers to consider for the project?

Review of initial skeleton costs- costs for intellectual property searches and applications, initial costs for purchase of domains, initial attorney fees, initial product development and market review costs, initial travel/R&D/development miscellaneous, initial go-to-market vision and development—and sources for initial skeleton costs

Review of best attorneys for intellectual property needs.

Review of best attorneys for corporate structure needs.

### Step 3

Securing of best manufacturing option- get initial samples, R&D tweaking, review initial costs and make modifications

Securing of intellectual property, and development of company and launch product names

Development of packaging and branding logos and design elements

Review of costs to enter market/ evaluation of funds needed to launch

Understanding and agreement of company structure

Understanding and agreement of principals' commitment, roles and contributions

Understanding and agreement of source of funds for launch and development

## Step 4

Set company structure in motion; birth entity with structure, intention, mission, clarity of funding, roles, commitments

Map out timetable for initial product launch plan and subsequent line launches

## Roles & Responsibilities to Launch with Excellence:

Product Launch Lead
-Manage all launch details on status report for continual update on timetable, dates due
-Champion/lead for pitches

Product Research & Development
-Internal research and development; testing of product ingredients, texture, flavor, shelf-life, packing concerns and options, quality testing/analysis

Product sourcing
-Research and locate best-fit co-packer options for product needs and expand to other line needs as well.
-Work with co-packers in R&D process, quality assurance, packaging sourcing, costing

Branding look/feel development and messaging
-Company Logo, Product Names, Packaging development with integrated message
-Coordinate packaging design with production spec needs (specific box size, inner wrap, structure to prohibit product breakage)
-Incorporate design into all planned communications, and develop launch timetable

Initial legal needs
-work with intellectual property attorneys for trademark searches and applications
-work with corporate lawyer (s) for company set-up, ownership, financial contributions, partners roles and responsibilities

Domain procurement
-Purchase of all relevant domain names and manage renewals

Strategic Plan/ Go-to-Market Plan
-Develop plan that lays out go-to-market strategies
-Prepare for pitch to investors and as roadmap for launch and growth

Financial Management, Plan and Funding
-Develop list of initial skeleton costs and source of funds for paying these costs
-Develop P&L projections, and incorporate funding sources/uses
-Purchase and set up Quickbooks as initial accounting system for company; consider bookkeeper to lead these efforts.
-Manage accounts receivables, account payables with regular reports; set payment terms for bills and pay on schedule.

Financial Partner(s)
-Provide funding to support launch and growth
-Offer board seats to investors/financial partners (with pursuit of partners who provide expertise for growth strategies and expansion)

Sales & Marketing/Distribution
-Pitch product to buyers in specialty channels
-Manage promotional schedule to support launch and growth.
-Develop support for initial distribution and expanded distribution; utilize critical broker networks to support
-Develop brand ambassador program, along with blogger network; explore opportunities for digital agency

Website development/Shopping Cart/Fulfillment
-Develop website that works with social media pages for integrated messaging; also use website for direct sales.

-Manage fulfillment orders via direct or 3rd party fulfillment; explore benefits of both.

## Issues to discuss and clarify:

-More clarity on each other's passions, dreams, strengths and weaknesses, and consideration of this in clarifying roles in launch and building of Cauli-Power.

-B corp issue/set-up structure

-Division of ownership, responsibilities, and funding options

-Next steps with Ricky/Bullpen option for % ownership in exchange for logo and initial launch materials

## Next Steps:

Define various options for company set-up:

Co-founders?
Me bringing expertise and Gail bringing money

Me as consultant and Gail as entrepreneur-

50/50 set up-
Gail could provide loan to business, to be paid back over time. For example, $200,000 as seed money to cover expenses

Ricky should have different class of stock.

# EXHIBIT E



**Law Offices**
CHICAGO-KENT
COLLEGE OF LAW

565 W. Adams Street
Chicago, Illinois 60661

312.906.5050

lawoffices@kentlaw.edu

**FACULTY ATTORNEYS**
Richard J. Gonzalez, Director
Daniel T. Coyne
Jonathan P. Decatorsmith
Rhonda de Freitas
Vivien C. Gross
Heather F. Harper
Pamela A. Kentra
Richard S. Kling
Edward Kraus
Laurie E. Leader

**STAFF ATTORNEYS**
Sarah Blenner
Matthew Daniels
Michael Johnson
Amy Kraus
Aisling O'Laoire
Tara O'Mahoney
Susana L. Ortiz
J. Jaz Park
Ni Sha

**OF COUNSEL**
Lori Andrews

www.kentlaw.edu

April 12, 2016

Kim Holstein, Founder
Gail Becker, Founder
CauliPower

Via email: <u>kim@</u>████████ & <u>beckergailf@</u>██████

Dear Kim and Gail:

Thank you for contacting the Startup Legal Shop at the Law Offices of Chicago-Kent (the "<u>Startup Legal Shop</u>") to act as legal counsel for the company you intend to form that you currently refer to as CauliPower (the "<u>Foundation</u>" or "<u>you</u>"). This letter will lay out the terms of our agreement as well as a description of the services we will provide to you.

Heather Harper will manage the legal work for your matters on behalf of the Startup Legal Shop. Other attorneys may also work on your matter from time-to-time under her supervision.

Unless we agree on a flat rate for services, we will provide legal services at an hourly rate of $260 for work performed by Heather Harper, $225 for work performed by Aisling O'Laoire. The minimum billing increment is ordinarily ¼ hour. We may collect a retainer for work conducted on an hourly basis, which will be held in trust until earned or refunded if unearned. If work takes longer than anticipated, or if we agree on additional hourly work in the future, we may, at our option, require you to replenish your retainer. If we do not require you to replenish your retainer, we will send you an invoice monthly for work done in the immediately preceding calendar month. It our policy in flat fee arrangements to collect an advance service retainer to cover the legal fee and any third-party filing fees. These fees are earned upon receipt.

In addition to our fees describe above, you will responsible for all out-of-pocket expenses incurred, including appropriate filing fees. Statements for out-of-pocket expenses will be submitted monthly or at other appropriate intervals. These will be paid promptly unless other arrangements are made.

We will provide general business counsel work to the Company at the hourly rates set forth above. We may mutually agree to perform additional legal work on the terms set forth in this agreement.

<u>Excluded Services</u>
Under certain circumstances, there may be issues on which it would be appropriate for the Company to obtain assistance elsewhere such as matters involving (a) complex and sophisticated tax planning, (b) regulatory compliance, (c) patents or (d) litigation (each an "<u>Excluded Service</u>" and collectively the "<u>Excluded Services</u>"). If such an issue arises during the course of our representation of the Company, we will call it to your attention so that you may consult with an attorney or other professional expert in that particular field.

**1 | P a g e**

## Waiver of Conflict

Each founder expressly acknowledges and agrees that the Startup Legal Shop currently represents Kim Holstein in her individual capacity in connection with the review and negotiation of her founders' agreements with the Company (the "Founders Documents"). Each founder acknowledges that an independent law firm will represent the Company in the preparation and negotiation of the Founders Documents, and Gail Becker has been advised of the advisability of her retaining independent counsel with respect to such documents. In the event that a dispute arises between the founders regarding the negotiation, execution and performance of the Founders Documents or any transactions contemplated thereby, the Startup Legal Shop may have a conflict and thus will not represent either Kim Holstein, the Company or any other founder in this matter. Additionally, the Company and each founder signing this letter understand and agree that the Startup Legal Shop represents many companies and individuals, including affiliates of founders. It is possible that during the time that we represent the Company, its employees or board members or some of our present or future clients will be engaged in transactions or encounter disputes with the Company. You agree that we may continue to represent, and may undertake in the future to represent the Company in its general business matters, Kim Holstein or her affiliates in connection with her Founders Documents or otherwise, existing or new clients in any matter, including litigation, that is not related to our work for you unless the interests of such clients in those matters are directly adverse to you. We agree, however, that the Company's limited advance consent to conflicting representations contained in the preceding sentence shall not apply in any instance where, as a result of our representation of the Company, we have obtained proprietary or other confidential information of a non-public nature that, if known by such other client, could be used in such other matter to the Company's disadvantage.

It is the Company's right as a client to terminate this engagement at any time on reasonable notice and upon the payment of all fees and expenses incurred to the date of termination. Upon the termination of our engagement or completion of the matters set forth above, the Startup Legal Shop will have no obligation to provide further legal assistance or advice or to inform you of changes in the law which could affect it. All files will be turned over to you on your written request except internal documents and drafts of documents, which we may retain.

We reserve the right to withdraw from representation if, among other things, you fail to honor the terms of this letter agreement by failing to pay my invoices, by failing to cooperate or follow our legal advice on a material matter, or if any fact or circumstance arises or is discovered that would, in our view, render my continued representation unlawful, unethical or impracticable.

The Startup Legal Shop is a teaching law firm. Some of the legal work for your matter may be provided by second and third year law students under the direct supervision of an experienced attorney. The Company will not be billed for any student work.

The purpose of this letter is to attempt to avoid any misunderstanding with respect to the terms of our engagement, and our rendering of legal services. Should you have any questions concerning the terms of our engagement, please give me a call.

2 | P a g e

4851-9723-9600, v. 1

We appreciate the opportunity to represent you in connection with these matters and look forward to working with you. Please sign and return a copy of this letter to confirm that you agree with the terms and conditions of our engagement.

Best,

*Heather Harper*

Heather Harper
Attorney
Startup Legal Shop
Law Offices of IIT Chicago-Kent

AGREED and ACCEPTED:

CauliPower

DocuSigned by:

*Kim Holstein*

By: Kim Holstein, Founder

DocuSigned by:

*Gail Becker*

By: Gail Becker, Founder

# EXHIBIT F

**CERTIFICATE OF FORMATION**
**OF**
**CauliPower, LLC**

This Certificate of Formation is being executed as of May 6, 2016 for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act.

The undersigned, being duly authorized to do so, does hereby execute and file this Certificate of Formation as follows:

1.     Name. The name of the limited liability company is CauliPower, LLC.

2.     Registered Office and Registered Agent. The limited liability company's registered office in the State of Delaware is located at 160 Greentree Drive, Suite 101 in the City of Dover, DE 19904, County of Kent. The name of its registered agent at such address is National Registered Agents, Inc.

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate of Formation as of the date first above written.

Kim Holstein, Authorized Person

# EXHIBIT G

# CT
Wolters Kluwer

# Invoice

Kim Holstein
CauliPower, LLC
Wilmette IL 60091-3240

| FOR INQUIRIES CONTACT: | Lisa DuBois | INVOICE NUMBER | INVOICE DATE |
|---|---|---|---|
| | CT Corporation South Team 2 | **15127569-RI** | 05/08/16 |
| | 1999 Bryan Street | ORDER NUMBER / ORDER DATE | CUSTOMER NUMBER |
| | Suite 900 | 9997449 SO / 05/08/16 | 9399874 |
| | Dallas TX 75201 | CUSTOMER REFERENCE - 1 | CUSTOMER REFERENCE - 2 |
| | Email: ctcorporationsouthteam2@wolterskluwer.com | DE Formation | |
| | Phone: (214) 932-3688  Fax: (214) 754-0922 | | |
| | | REQUESTED BY | AMOUNT DUE |
| | Attention: Lisa DuBois | AMBER HOWARD | $409.00 |
| | (Federal Tax Id # 51-0006522) | | |

Page 1 of 1

| | QUANTITY | UNIT PRICE | AMOUNT DUE |
|---|---|---|---|
| **CauliPower, LLC (DE)** | | | |
| *Services -* | | | |
| Formation - Delaware | 105.00 | | |
| Domestic Rep (LLC) - Delaware | 189.00 | | |
| *Disbursements -* | | | |
| Formation - Delaware | | 90.00 | |
| Jurisdiction Handling Fee - Delaware | | 25.00 | |
| SUBTOTAL | 294.00 | 115.00 | $409.00 |

## SUMMARY

| | |
|---|---|
| Service Charges | $294.00 |
| Disbursements | 115.00 |
| **TOTAL AMOUNT DUE** | **$409.00** |

To pay by mail, detach and return this stub with your payment using the enclosed envelope.
For proper credit, indicate your complete invoice number, including the two characters
following the invoice number, on the check. To pay by Credit/Debit card or Electronic Funds
Transfer complete the form on the reverse of this stub.

**Pay online at nrai.com**

 

REMIT PAYMENTS ONLY TO:   NRAI, Inc.
PO Box 4349
Carol Stream IL 60197-4349

| INVOICE NUMBER | INVOICE DATE |
|---|---|
| **15127569-RI** | 05/09/16 |
| CUSTOMER NUMBER | AMOUNT DUE |
| 9399874 | $409.00 |

Due Upon Receipt

Kim Holstein
CauliPower, LLC
1434 Isabella St
Wilmette IL 60091-3240

402 1 00009399874 15127569 8273 000040900 09997449 8379 0